**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| KEVIN ROSE, derivatively on behalf of XPO LOGISTICS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> BRADLEY S. JACOBS, JOHN J. HARDIG, GENE L. ASHE, ANNAMARIA DESALVA, MICHAEL G. JESSELSON, ADRIAN P. KINGSHOTT, JASON D. PAPASTAVROU, OREN G. SHAFFER, and LOUIS DEJOY, <br><br> Defendants, <br><br> and <br><br> XPO LOGISTICS, INC., <br><br> Nominal Defendant. | Civil Action No.: <br><br><br> DEMAND FOR JURY TRIAL |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff Kevin Rose ("Plaintiff"), by and through his counsel, derivatively on behalf of Nominal Defendant XPO Logistics, Inc. ("XPO" or the "Company"), submits this Verified Stockholder Derivative Complaint against the Individual Defendants (defined herein) and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which included, *inter alia*, review and analysis of: (i) regulatory filings made by XPO with the U.S. Securities and Exchange Commission (the "SEC"); (ii) press releases issued and disseminated by XPO; (iii) a purported class action lawsuit

filed in the United Stated District Court for the District of Connecticut against XPO, Inc., and defendants Bradley S. Jacobs ("Jacobs"), John J. Hardig ("Hardig") and Scott B. Malat ("Malat") captioned *Labul v. XPO Logistics, Inc.*, Case No. 3:18cv2062, alleging violations of the federal securities laws based on the alleged issuance of false and misleading statements of material fact, and the alleged omission to state material facts necessary to make other statements made not misleading, between August 3, 2016 through and including February 14, 2019 (the "Relevant Period") with respect to XPO's unsustainable growth rates (the "Securities Class Action")[1]; and (iv) other publicly available information, including media and analyst reports, concerning XPO.

## NATURE OF ACTION

1.      This is a stockholder derivative action asserting claims for breach of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and SEC rule 14a-9 promulgated thereunder brought on behalf of nominal defendant XPO against certain officers and members of the Company's Board of Directors (the "Board").

2.      XPO is a publicly-traded transportation and logistics company headquartered in Greenwich, Connecticut. Prior to the second quarter of 2016 ("2Q16"), XPO consistently lost

---

[1] On June 3, 2019 a Consolidated Class Action Complaint for Violations of the Federal Securities Laws was filed in the Securities Class Action (the "Securities Complaint"). While Plaintiff and his undersigned attorneys have conducted their own independent investigation of the wrongdoing alleged herein, many of the allegations herein are based upon allegations in the Securities Class Action. The Securities Complaint includes excerpts from interviews or consults with various individuals, including former XPO employees who worked at the Company and other individuals who are current or former employees of entities that did business with the Company and are knowledgeable about XPO's business and operations and the industry in which XPO operates. Any references to quotes or information from these individuals in this derivative complaint come from the Securities Complaint.

money and failed to grow profits. However, that all changed when XPO, through its acquisition of another company, inherited a lucrative business relationship with Amazon.

3.      Through a series of false and misleading statements, the Individual Defendants concealed Amazon's importance as an XPO client. Instead, from August 2016 into 2018, the Individual Defendants falsely proclaimed to investors that XPO was poised for broad-based growth, premised on "a diversified customer base that minimize[d] concentration risk."

4.      Contrary to their public representations, the Individual Defendants knew that Amazon, and not a diversified customer base, was materially responsible for XPO's above-industry growth rates during the Relevant Period and, critically, that the Company's Amazon-induced growth rates were going to come to an end.

5.      The Individual Defendants knew that the Company's growth rates were unsustainable because Amazon had informed the Individual Defendants that it was going to wind down doing business with the Company over the long term. Despite their actual knowledge of Amazon's plans to leave XPO, the Individual Defendants misled investors during the Relevant Period, publicly stating that they were not aware of any "unsustainable" business conditions contributing to XPO's newfound profitability.

6.      In or around April 2018, XPO's underlying core business started to slow down because Amazon had begun acting on its previously stated business plans to leave XPO. In fact, the Individual Defendants hastened Amazon's exit. Famously competitive, Amazon accelerated its departure right around the time that the Individual Defendants acted against Amazon's business interests. On April 23, 2018, XPO announced that it had hired away one of Amazon's top executives to serve as XPO's new Chief Operating Officer ("COO"), and the next day XPO rang

the New York Stock Exchange ("NYSE") opening bell to announce a new service that competed directly with one of Amazon's core business offerings.

7.     Amazon immediately started lowering the amount of freight that it shipped via XPO and similarly started shutting down XPO fulfillment centers that otherwise would have continued to handle logistics for Amazon deliveries to end-customers. These declining operating activities were essentially the beginning of the end of XPO's lucrative business relationship with Amazon.

8.     Even though losing Amazon caused severe operational and strategic problems for XPO, the Individual Defendants concealed those problems from investors. To that end, the Individual Defendants publicly represented to investors that lower shipping volumes were part of a supposed "strategy" or "decision" by XPO to improve the profitability of its transportation business. Behind the scenes, however, XPO was scrambling unsuccessfully to find new customers who could fill the void left by Amazon.

9.     Although XPO felt the effects of Amazon's exit by the summer 2018, the Individual Defendants tried to hide from the public that the Company's secret growth ingredient was going away. When Amazon had taken sufficient business away from XPO that it materially contributed to an "earnings miss" in the third quarter of 2018 ("3Q18"), for example, the Individual Defendants publicly (and misleadingly) blamed the miss on a customer in England whom the Individual Defendants labelled a "rounding error." In fact, Amazon's departure was a, if not the, material contributing factor to XPO's third quarter earnings miss.

10.     During the Relevant Period, Amazon was XPO's largest customer by revenue, generating above-average earnings margins that resulted in XPO's premium growth rates. Amazon was also essential to XPO's growth rates because Amazon itself was growing at over 45% during

2016-2018, meaning its key vendors, such as XPO, could also grow at significant rates—assuming those vendors could continue their business relationships with Amazon.

11.     As the Individual Defendants continued to conceal Amazon's departure from investors during the summer and fall of 2018, XPO made unexpected announcements that its Chief Financial Officer ("CFO"), defendant Hardig, and its Chief Strategy Officer ("CSO"), defendant Malat, would be resigning. Those two executives had appeared with XPO's Chairman and Chief Executive Officer ("CEO"), defendant Jacobs, for years to make reports to investors and answer their questions during earnings calls. They were essentially the face of the Company from the market's point of view. But in the summer and fall of 2018, they left leaving Jacobs to face investors alone when explaining XPO's 3Q18 earnings miss.

12.     This time, Defendant Jacobs concocted a plan that would hide XPO's loss of Amazon as a customer. As defendant Jacobs attempted to blame the entirety of XPO's third quarter of 2018 miss on the "rounding error" customer, he also told investors that XPO had decided to re-engage in active discussions with potential merger partners.

13.     By December 2018, XPO was indeed close to completing a merger that would have purportedly "doubled" XPO's size, according to defendant Jacobs. If XPO had succeeded in completing this merger, the new, combined company would have filed combined or "consolidated" financial statements for the year, making it nearly impossible for investors to see the toll that losing Amazon's business had taken on XPO as a standalone company.

14.     But that plan fell apart when XPO management let slip negative financial information to a few investors during trading hours at a private lunch meeting on December 11, 2018. Trading authorities found out about the leak on December 12, 2018, and halted trading until XPO disclosed the negative information to the entire market. XPO then reported materially lower

growth rates and financial performance for 2018 and beyond, reflecting the loss of Amazon as a client of XPO. This negative financial information immediately depressed XPO's stock value and scuttled merger discussions for the rest of 2018.

15.     The loss of the potential merger left the Individual Defendants no place left to hide the loss of Amazon as a customer by the time XPO filed its 2018 SEC Form 10-K ("2018 10-K") and publicly gave financial guidance to the market in February 2019.

16.     Thus, on February 14, 2019, XPO finally publicly revealed that it had lost its "largest customer," Amazon. Even as the Individual Defendants admitted that XPO was losing its largest customer, management *still* maintained that the loss was a complete surprise. Defendant Jacobs claimed that Amazon had left "quickly" and "abruptly."

17.     Throughout the Relevant Period, Amazon's actions materially affected XPO's operations, results and prospects as the Company grew. Consequently, XPO's largest customer also had a material financial impact on XPO's operations, results, and prospects as Amazon started to cut its business ties with the Company. Given how important Amazon was to XPO as a customer, the Individual Defendants knew or reasonably should have known these material facts. The concealment of these facts rendered numerous public statements by the Individual Defendants materially false and/or misleading.

18.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law, XPO has sustained damages as described below.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

23.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

24.     Venue is proper in this District because XPO and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

25.     Plaintiff is a current shareholder of XPO common stock and has continuously held XPO common stock at all relevant times.

26.     Nominal Defendant XPO is a Delaware corporation with its principal executive offices at Five American Lane, Greenwich, CT, 06831. XPO's shares trade on the NYSE under the ticker symbol "XPO."

27.     Defendant Jacobs has served as the Company's CEO and as Chairman of the Board since September 2011 when he acquired the Company through Jacobs Private Equity, LLC ("JPE"), the Company's largest stockholder. He is also the managing member of JPE and therefore a controlling shareholder of the Company. According to the Company's Schedule 14A filed with the SEC on April 22, 2019 (the "2019 Proxy Statement"), as of April 12, 2019, defendant Jacobs

beneficially owned 19,799, 601 shares of the Company's common stock, which represented 17.7% of the Company's outstanding shares of common stock on that date and 94.9% of the Company's Series A Preferred Stock.[2] Given that the price per share of the Company's common stock at the close of trading on April 12, 2019 was $63.19, defendant Jacobs owned over $1.2 billion worth of XPO stock. According to the Company's 2018 10-K, defendant Jacobs "controls a large portion of [Company] stock and has substantial control over [the Company], which could limit other stockholders' ability to influence the outcome of key transactions, including changes of control." The Company's 2018 10-K further outlined in relevant part:

> Under applicable SEC rules, our Chairman and Chief Executive Officer, Mr. Bradley S. Jacobs, beneficially owns approximately 15% of our outstanding common stock as of December 31, 2018. This concentration of share ownership may adversely affect the trading price for our common stock because investors may perceive disadvantages in owning stock in companies with concentrated stockholders. Our preferred stock votes together with our common stock on an "as-converted" basis on all matters, except as otherwise required by law, and separately as a class with respect to certain matters implicating the rights of holders of shares of the preferred stock. **Accordingly, Mr. Jacobs can exert substantial influence over our management and affairs and matters requiring stockholder approval, including the election of directors and the approval of significant corporate transactions, such as mergers, consolidations or the sale of substantially all of our assets. Consequently, this concentration of ownership may have the effect of delaying or preventing a change of control, including a merger, consolidation, or other business combination involving us, or discouraging a potential acquirer from making a tender offer or otherwise attempting to obtain control, even if that change of control would benefit our other stockholders.** Additionally, significant fluctuations in the levels of ownership of our largest stockholders, including shares beneficially owned by Mr. Jacobs, could impact the volume of trading, liquidity and market price of our common stock.**[3]**

For the fiscal year ended December 31, 2018, defendant Jacobs received $13,327,471 in compensation from the Company. This included $625,000 in salary, $12,690,463 in stock awards, and $12,008 in all other compensation.

---

[2] These shares included the shares owned indirectly by Defendant Jacobs as the managing member of JPE and 263,887 shares of common stock held directly by Defendant Jacobs.

[3] Unless stated otherwise, all emphasis is added.

28.     Defendant Hardig served as XPO's CFO from February 2012 until he stepped down from his position in August 2018. According to the 2019 Proxy Statement, as of February 21, 2018, defendant Hardig beneficially owned 115,598 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 21, 2018 was $93.99, Defendant Hardig owned approximately $10.8 million worth of XPO stock. For the fiscal year ended December 31, 2018, defendant Hardig received $359,688 in compensation from the Company. This included $324,846 in salary and $34,842 in all other compensation.

29.     Defendant Malat was the CSO from July 9, 2012 until December 8, 2018. Malat first joined XPO on October 20, 2011 as its senior vice president-strategic planning.

30.     Defendant Gene L. Ashe ("Ashe") has served as a Company director since March 2016 and also serves as a member of the Audit Committee and the Acquisition Committee. Defendant Ashe has also served as vice-chairman of XPO Logistics Europe S.A., a majority owned subsidiary of the Company. For the fiscal year ended December 31, 2018, defendant Ashe received $272,192 in compensation from the Company. This included $80,645 in fees earned or cash paid and $191,546 in stock awards. Defendant Ashe also received €65,000 in fees for her service as vice- chairman of the Supervisory Board of XPO Logistics, S.A.

31.     Defendant AnnaMaria DeSalva ("DeSalva") has served as a Company director since September 2017. She became the Chairman of Nominating and Corporate Governance Committee in May 2018 and was appointed Vice Chair of the Board on February 7, 2019. For the fiscal year ended December 31, 2018, defendant DeSalva received $275,900 in compensation from the Company. This included $84,354 in salary and $191,546 in stock awards.

32.     Defendant Michael G. Jesselson ("Jesselson") has served as a Company director since September 2011 and as lead independent director since March 2016. He also serves as a member of the Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of April 12, 2019, defendant Jesselson beneficially owned 347,764 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2019 was $63.19, defendant Jesselson owned approximately $21.9 million worth of XPO stock. For the fiscal year ended December 31, 2018, defendant Jesselson received $291,546 in compensation from the Company. This included $100,000 in salary and $191,546 in stock awards.

33.     Defendant Adrian P. Kingshott ("Kingshott") has served as a Company director since September 2011. He also serves as Chairman of the Compensation Committee and as a member of the Acquisition Committee. According to the 2019 Proxy Statement, as of April 12, 2019, defendant Kingshott beneficially owned 134,013 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2019 was $63.19, defendant Kingshott owned approximately $8.4 million worth of XPO stock. For the fiscal year ended December 31, 2018, defendant Kingshott received $281,546 in compensation from the Company. This included $90,000 in salary and $191,546 in stock awards.

34.     Defendant Jason D. Papastavrou ("Papastavrou") has served as a Company director since September 2011. He also serves as a member of the Audit Committee, Compensation Committee, Acquisition Committee, and the Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of April 12, 2019, defendant Papastavrou beneficially owned 242,888 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2019 was $63.19, defendant

Papastavrou owned approximately $15.3 million worth of XPO stock. For the fiscal year ended December 31, 2018, defendant Papastavrou received $281,546 in compensation from the Company. This included $90,000 in salary and $191,546 in stock awards.

35.     Defendant Oren G. Shaffer ("Shaffer") has served as a Company director since September 2011. He also serves as Chairman of the Audit Committee. Defendant Shaffer has additionally served as a director for Terex Corporation since 2007. According to the 2019 Proxy Statement, as of April 12, 2019, defendant Shaffer beneficially owned 66,799 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2019 was $63.19, defendant Shaffer owned approximately $4.2 million worth of XPO stock. For the fiscal year ended December 31, 2018, defendant Shaffer received $291,546 in compensation from the Company. This included $100,000 in salary and $191,546 in stock awards.

36.     Defendant Louis DeJoy ("DeJoy") served as a Company director from December 2015 until May 2018. While with the Company, he served as a member of the Acquisition Committee. He also served as the CEO of the Company's supply chain business in the Americas until December 2015 and was chairman and CEO of New Breed Logistics, which the Company acquired in 2014. According to the Company's Schedule 14A filed with the SEC on April 18, 2018, (the "2018 Proxy Statement"), as of April 6, 2018, defendant DeJoy beneficially owned 1,134,686 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 6, 2018 was $96.23, defendant DeJoy owned approximately $109.1 million worth of XPO stock. For the fiscal year ended December 31, 2017, defendant DeJoy received $248,489 in compensation from the Company. This included $75,000 in fees earned or cash paid and $173,489 in stock awards. In addition, the Company leases

office space from three entities partially owned and controlled by defendant DeJoy. For the year ended December 31, 2018, the Company made aggregate rent payments of $1.86 million on these lease agreements.

37.     The defendants referenced above in ¶¶ 27-46 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

38.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

39.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

40.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of XPO were required to, among other things:

41.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

42.     conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

43.     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

44.     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

45.     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

46.     Each Individual Defendant, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a conscious disregard for their duties to the Company and its

stockholders that Individual Defendants were aware or should have been aware posed a risk of

serious injury to the Company.

47.     In addition, the Company has also adopted a Code of Business Ethics (the "Code").

As noted on the first page of the Code, in "A Message From Leadership" by Defendant Jacobs:

> Everyone at our company is held to the same high standards: our management, board of directors, employees, suppliers and business partners. This makes it easier for us to meet our obligations as a team. The Code also serves to communicate our integrity to the business community and the public at large.

48.     The Code goes on to state, in pertinent part:

> Our mission is to deliver results. This requires us to perform to the highest standards of business conduct at all times. We will not compromise our values to meet commercial objectives. Our values are critical to our success.
>
> Our Code is a blueprint of the company's business standards. All XPO employees, officers and directors must comply with the Code, as must other parties acting on XPO's behalf. These standards apply any time you are representing XPO or engaged in activities that could have an impact on XPO's business or reputation.
>
> \*\*\*
>
> XPO's management is committed to leading by example in ways that reflect our company values. This includes responding in a timely manner to employee concerns, addressing compliance risks, and providing reporting resources to ensure potential violations of company policy or law are identified and addressed.
>
> \*\*\*
>
> Failure to comply with the Code, company policies or applicable laws, rules or regulations carries consequences, including possible termination of employment, or other disciplinary actions. Some violations may also be subject to civil or criminal penalties.
>
> \*\*\*
>
> XPO accurately portrays its business capabilities. You may not make false or misleading statements about XPO's services or those of our competitors; you should never knowingly misrepresent facts to gain a competitive advantage or for any other purpose.
>
> \*\*\*

14

Our company's senior financial officers must ensure that all financial information disclosed in public communications and in periodic reports with the U.S. Securities and Exchange Commission is complete, accurate, timely and understandable. Persons responsible for preparing such documents must ensure that all accounting records, and the reports produced from such records, fairly and accurately represent the transactions to which they relate. These records and reports must include reasonable detail and be supported by appropriate documentation. If you become aware of anything in the company's accounting records or reports that is false or misleading, inform the company's Chief Legal Officer immediately.

49.    Furthermore, as noted in the Company's DEF 14A filed with the SEC on April 22, 2019 (the "2019 Proxy"):

Our business and affairs are managed under the direction of our Board of Directors, which is our company's ultimate decision-making body, except with respect to those matters reserved to our stockholders. Our Board's primary responsibility is to seek to maximize long-term stockholder value. Our Board establishes our overall corporate policies, selects and evaluates our senior management team, which is charged with the conduct of our business, monitors the performance of our company and management, and provides advice and counsel to management. In fulfilling the Board's responsibilities, our directors have full access to our management, internal and external auditors and outside advisors.

50.    Moreover, the Board's Audit Committee, which is and had been comprised of defendants Ashe, Jesselson, Kingshott, Papastavrou and Shaffer during the Relevant Period, has a heightened duty under the Audit Committee Charter, which states:

The primary purposes of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of XPO Logistics, Inc. (the "Company") are:

(A) to assist the Board in fulfilling its responsibility to oversee (i) the Company's accounting and financial reporting processes, including the effectiveness of the Company's systems of internal controls and disclosure controls, (ii) the integrity of the Company's financial statements, (iii) the Company's compliance with legal and regulatory requirements, (iv) the qualifications and independence of the Company's outside auditors and (v) the performance of the Company's outside auditors and internal audit function; and

(B) to prepare the audit committee report required by the rules and regulations of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement or annual report on Form 10-K.

51.    The Audit Committee Charter then goes on to state:

The Committee shall have the following specific authority and responsibilities (in addition to any others that the Board may from time to time delegate to the Committee):

*Financial Reporting Process and Financial Statements Integrity*

- The Committee shall meet regularly (and, in any event, no less than quarterly) in separate sessions with (a) the outside auditors, (b) management and (c) the Company's internal auditors (or other personnel responsible for the internal audit function).
- The Committee shall review and discuss with management and the outside auditors the Company's annual audited financial statements and quarterly financial statements, including the Company's disclosures in the related "Management's Discussion and Analysis of Financial Condition and Results of Operation".
- The Committee shall review and discuss with management and the outside auditors (i) significant accounting and financial reporting issues and judgments made in connection with the preparation of the Company's financial statements and other public reports, including the Company's selection and application of significant accounting principles; (ii) the development, selection and disclosure of critical accounting policies and estimates; (iii) the effect of financial reporting and accounting initiatives and any related party or off-balance sheet transactions on the Company's financial statements; (iv) any analyses prepared by management or the outside auditor of the effect of alternative assumptions, estimates or GAAP methods on the Company's financial statements; and (v) the type and presentation of any "pro forma", or "adjusted" non-GAAP, information.
- In connection with the annual audit and the review by the outside auditors of the financial information included in the Company's Quarterly Reports on Form 10Q, the Committee shall, prior to the release of earnings or the filing of the Form 10-K or Form 10-Q, as applicable, discuss with the outside auditors the matters required to be discussed by Statement on Auditing Standards No. 61, as amended or supplemented (or any successor auditing standard statements).
- The Committee shall recommend to the Board whether the Company's annual audited financial statements should be included in the Company's Annual Report on Form 10-K.
- The Committee shall review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's outside auditors, or the performance of the internal audit function.
- The Committee shall receive from the Company's outside auditors timely reports concerning:

> (a) all critical accounting policies and practices to be used;

(b) all alternative treatments of financial information within generally accepted accounting principles that have been discussed with the management of the Company, the ramifications of the use of such alternative disclosures or treatments and the treatment preferred by the auditors; and

(c) other material written communications between the auditors and the management of the Company, such as any management letter or schedule of unadjusted differences.

- The Committee shall review with the outside auditors and, if applicable, the internal auditors any audit problems or difficulties and management's response. The review should include any restrictions on the scope of the outside auditors' activities or access to requested information and any communications or disagreements with management.

- The Committee shall confirm with the Company's outside auditors that they are not aware of any information indicating that any illegal act has or may have occurred that would necessitate a response under Section 10A(b) of the Exchange Act.

- The Committee shall discuss with management, the outside auditors and the internal auditors the quality and adequacy of the Company's internal controls, any special steps adopted in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting.

- The Committee shall discuss with management its process for performing its required quarterly certifications under Section 302 of the Sarbanes-Oxley Act, including the evaluation of the effectiveness of disclosure controls by the Chief Executive Officer and Chief Financial Officer.

- The Committee shall prepare the report of the audit committee required by the rules of the SEC to be included in the Company's annual proxy statement.

- The Committee shall discuss with management the Company's earnings press releases as well as financial information and earnings guidance provided to analysts and rating agencies (paying particular attention to any use of "pro forma," or "adjusted" non-GAAP, information). The Committee shall discuss with management policies with regard to the types of information to be disclosed and the types of presentation to be made with respect to that disclosure.

*Risk Assessment and Management*

- The Committee shall discuss with management, the outside auditors and, if applicable, the internal auditors the guidelines and policies that govern the process by which the Company's exposure to risk is assessed and managed by management, including the risk of fraud.

- In connection with the Committee's discussions of the Company's risk assessment and management guidelines and policies, the Committee may discuss or consider the Company's major financial risk exposures and the steps

that the Company's management has taken to monitor and control these exposures.

52.     The Individual Defendants failed to maintain the standards laid out by both the law and the Company, resulting in the breaches of fiduciary duty and the violations of Section 14(a) and Rule 14a-9 described herein.

## SUBSTANTIVE ALLEGATIONS

*Company Background*

53.     XPO provides transportation and logistics services and has corresponding "transportation" and "logistics" SEC reporting segments.

54.     In its transportation segment, XPO manages a transportation network that offers customers various means of transporting their goods. Some of the Company's service offerings in the transportation segment include freight brokerage, less-than-truckload ("LTL"), and "last mile" services. The Company uses trucks to move most of its freight and uses a blended model of owned, contracted, and brokered capacity to provide truck transportation services.

55.     In its logistics segment, XPO provides services that help fulfill orders of goods that are purchased on the internet. XPO provides a number of other services in its logistics segment, including warehousing and distribution services. XPO sometimes refers to its logistics segment as the supply chain or contract logistics segment.

***In 2016, Amazon Single-Handedly Pushed XPO Past Its "Positive Inflection" Point, but the Individual Defendants Represented the Company to Investors as Well Diversified with Minimal Exposure to Customer "Concentration Risk"***

56.     A money-losing enterprise for years, XPO began growing profits and revenue in 2016 at rates that exceeded its industry peers and made it the darling of Wall Street in its industry during the Relevant Period.

57.     In fact, the second quarter of 2016 was the first time that XPO reported a profit in at least four years as e-commerce business surged. The Individual Defendants published the Company's financial results to the market on August 3, 2016, and the following day, told the market that the Company had passed a positive inflection point in its growth story during its earnings call with analyst and investors. During a conference call with analysts and investors on August 4, 2016, defendant Jacobs assured investors that the Company was generating record financial growth from a well-diversified base of business, concluding the call as follows:

> We started the call with saying that we're at a positive inflection point in the evolution of our Company. And that we are reaping the rewards of the last five years. We have built *a very well diversified*, well-functioning global business that provides significant value to our customers.

> The proof is in the pudding. Look at the numbers this quarter. We had record EBITDA, way above expectations. We had record cash flow from ops, way above expectations. Record free cash flow. *We have a clearly defined action plan to go from $1.265 billion of EBITDA this year to our $1.7 billion target in 2018.*

58.     Industry publications and Wall Street analysts repeated the Individual Defendants story of a "dream quarter" and that XPO was finally on the road to growth. For example, in an August 4, 2016 report, an analyst from Deutsche Bank Securities Inc. ("Deutsche Bank") wrote that, "[y]esterday after the close, XPO reported Q2 adjusted EBITDA of $354.9 million which was well above our estimate of $340.8 million and Consensus of $316.9 million." Additionally, an analyst from Barclays Capital Inc. ("Barclays") that same day wrote, "XPO results surprised to the upside and importantly also delivered cash flow commensurate with adjusted earnings, dispelling some of the most bearish views on the company."

59.     Defendant Jacobs fueled these growth expectations during the earnings call by touting the Company's "clearly defined action plan" to grow earnings nearly 35% over the 2016 through 2018 period.

60.     In reality, the Individual Defendants had no "clearly defined action plan" other than having Amazon as a customer. From 2016 through part of 2018, Amazon materially contributed to XPO's favorable growth trajectory. The Individual Defendants did not identify Amazon as its largest customer until much later, but as a frame of reference, according to the Company's 2014 10-K, XPO's then-largest customer accounted for $117 million in revenue for the calendar year 2014. In 2015, the Company combined its financial statements with Con-Way in XPO's annual report on account of the late-2015 merger of those companies under the XPO name. According to XPO's 2015 10-K, the combined financial statements showed XPO's largest customer accounting for $267 million in revenue in 2015 and $438 million in revenue in 2016. This "largest customer" was Amazon.[4] Amazon contributed approximately $848 million to XPO's revenue in 2017.[5]

61.     Amazon thus grew from a $438 million annual revenue customer in 2016 to a customer that was supposed to generate over $900 million in 2018—a 105% increase. There is no

---

[4]     XPO did not identify Amazon as the largest customer at the time, but, in the Company's 2016 10-K, it reported that its "largest customer" accounted for 3% of $14.6 billion in revenue.

[5]     This estimate of Amazon's revenue contribution to XPO for the 2017 calendar year rests on the following facts. Jacobs told investors on February 15, 2019 that XPO's largest customer (*i.e.*, Amazon) had grown XPO "a lot" over the past few years. ¶148. This admission shows Amazon contributed increasing amounts of revenue in 2016, 2017, and 2018; thus, the 2017 calendar year revenue contribution was somewhere between the revenue it contributed in 2016, and the amount of revenue that Amazon contributed to XPO in 2018 of about $900 million (although expected revenues were materially higher that year). *See* ¶150. During a May 2, 2019 conference call with analysts and investors, defendant Jacobs referred to Amazon as getting "a little more than 1/2" of "about 11%" revenue previously. In its 2017 10-K, XPO stated that it had "a diversified customer base that minimizes our concentration risk: in 2017, approximately 10% of our revenue was attributable to our top five customers," and that revenue for the year was $15.38 billion. Assuming Amazon accounted for "a little more than 1/2" of the 10% figure cited in XPO's 2017 10-K, it is possible to estimate it contributed 5.5% to revenue that year or approximately $845 million in revenue. This figure is consistent with Jacobs' later admission that the Company grew "a lot" with Amazon over the prior few years because it is higher than 2016 revenue but still about $100 million smaller than the greater-than-$950 million in revenue that XPO had projected for 2018, and less than the approximately $900 million in revenue that Amazon ultimately contributed to 2018.

question that Amazon was the key contributor to XPO's above-industry growth rates during the Relevant Period.

62.     All the while, the Individual Defendants knew that XPO's above-industry growth rates were unsustainable given Amazon's stated business plans. Specifically, Amazon told the Individual Defendants that it was going to cease its business relationship with XPO over the long term.

63.     Yet the Individual Defendants said nothing about Amazon's role in single-handedly growing the Company's revenue and generating XPO's favorable growth results through the second quarter of 2018 ("2Q18"), even in the face of analysts asking whether XPO's growth was sustainable over the long term. On a May 4, 2017 conference call with analysts and investors, defendant Jacobs responded to one such question during an XPO quarterly earnings call:

> [KeyBanc Capital Markets Inc. ("KeyBanc") analyst:] Let me ask it this way, is there *anything in the first quarter that you view as being unsustainable* or anything that kind of helped you if it was fuel trends in the LTL business *or something that you're watching that, that may not repeat* in the first quarter as you think about the progression through the year?

> [Jacobs:] *I don't*, Todd. I think the first quarter was a quarter where we had to work hard. And we had some headwinds, we had some tailwinds. But internally, as an organization, it's really jelling. And people are very focused on the right levers in order to improve both the profitability of the company and customer service at the same time. *And it's broad-based by our different business lines and by our geography*. So I am optimistic about the year, starting off on a very good foot.

64.     Defendant Jacob assured investors that XPO was a company experiencing broad-based growth from a diversified customer base. Further, during the Relevant Period, defendant Jacob consistently and repeatedly assured investors about the Company's low customer "concentration risk" despite the Company's growing reliance on Amazon's business.

65.     As XPO's customer concentration risk increased in tandem with Amazon's growing importance to the Company, the Individual Defendants made disclosures that reasonable

investors would interpret to mean that XPO had actually lowered its dependence upon any single customer. Throughout its existence, the Individual Defendants encouraged investors to compare XPO's activities on a year-over-year or quarter-over-quarter basis. A reasonable investor comparing relevant disclosures from XPO's 2017 10-K with its 2016 and 2015 10-Ks would reasonably understand that no single customer accounted for more than 3% of XPO's revenue in 2017 given the specific changes that XPO made year-over-year to its customer concentration risk disclosure.

66.     In fact, the Individual Defendants purposely *deleted* the passage that had previously disclosed the size of its largest customer while making an otherwise substantially- identical disclosure in its 2017 10-K. The 2015 10-K stated:

> **Customers, Sales and Marketing**
> Our Company provides services to a variety of customers ranging in size from small, entrepreneurial organizations to *Fortune 500* companies. During 2015, our business units served more than 50,000 different customers. Approximately 6.6% of our 2015 pro forma revenue was attributable to our top five clients, with our largest customer accounting for approximately 1.8% of our pro forma revenue.

Meanwhile, the 2016 10-K stated:

> **Customers, Sales and Marketing**
> Our Company provides services to a variety of customers ranging in size from small, entrepreneurial organizations to multi-national industry leaders. We have a diversified customer base that minimizes our concentration risk: in 2016, approximately 8% of our revenue was attributable to our top five clients, with our largest customer accounting for approximately 3% of revenue.

Then in the 2017 10-K, the passage was changed to delete the "largest customer" information:

> **Customers, Sales and Marketing**
> Our Company provides services to a variety of customers, ranging in size from small, entrepreneurial organizations to *Fortune 500* companies and global industry

leaders. We have a diversified customer base that minimizes our concentration risk: in 2017, approximately 10% of our revenue was attributable to our top five customers.

67.     As the comparison between XPO's 2015, 2016, and 2017 customer concentration statements indicates, the Individual Defendants made a conscious choice in 2017 to remove information that would have revealed a dramatic increase in its reliance on its largest customer. Considered in light of the text immediately preceding it about having a diverse customer base "that minimizes our concentration risk," a reasonable investor would conclude that XPO had lowered or at least maintained its customer concentration risk; not that Amazon had substantially increased XPO's customer concentration risk. The risk was particularly material because Amazon informed the Individual Defendants that its business plans were to cease business operations with XPO over the long term. The very risk that customer concentration creates in an investment is that a big customer might leave the company and, in this case, Amazon had already told the Individual Defendants that it was going to leave XPO.

***In 2018, After Enjoying Years of Above-Industry Growth Rates Thanks to Amazon, XPO "Rings the Opening Bell" at the NYSE to Announce Its Decision to Compete Directly with One of Amazon's Most Important Businesses***

68.     The Individual Defendants knew: (1) how important Amazon was to XPO in 2018; and (2) that Amazon's stated business plan was to leave XPO. However, instead of trying to retain Amazon, the Individual Defendants did the exact opposite. The Individual Defendants caused the Company to take aggressive competitive actions against one of Amazon's most important business lines: Fulfilment by Amazon ("Amazon FBA"), thereby accelerating Amazon's decision to leave XPO.

69.     Amazon FBA is a warehousing and distribution service that drove billions of dollars' worth of business to Amazon and is one of Amazon's central strategic initiatives because it increased the amount of money that Amazon made by selling third parties' goods on its platform.

70.     Sometime in 2018, the Individual Defendants decided to copy Amazon FBA. XPO called its new competing business "XPO Direct," and offered it out to all businesses that wanted to do e-commerce, which, of course, included Amazon's customers. XPO announced the competing service on April 24, 2018, in a press release titled "XPO Logistics Launches New Flexible Distribution Model for Omnichannel Retail and E- Commerce Customers." XPO's press release proudly announced that: (1) "'XPO Direct' speeds shipments to consumers using shared network capacity," and (2) "XPO to mark launch *by ringing Opening Bell* at New York Stock Exchange on April 25." The announcement and ringing of the NYSE opening bell sent a clear message that XPO intended to take Amazon head-on in one of Amazon's key business lines.

71.     In its April 2018 press release, the Individual Defendants elaborated on XPO Direct's features. The service put customers' goods within two days' delivery of nearly the entire U.S. population, enabling retailers and e-commerce retail businesses to store their goods close to end customers and to fulfill the end customers' orders within two days "at a fraction of the usual cost," according to XPO's April 24, 2018 press release. In other words, XPO promoted the idea that XPO Direct was cheaper than the usual cost incurred at competing services, like Amazon FBA.

72.     A Deutsche Bank analyst later observed in a February 18, 2019 report that XPO Direct was very "similar, if not exactly like, Fulfillment by Amazon," and a comparison of the two services shows this observation was well-founded. Amazon maintained a description of its Amazon FBA services on one of its websites in early 2018, before XPO launched XPO Direct.

There, Amazon explained that it offered its service to third parties who "sell on Amazon," just as XPO offered out its XPO Direct to third party "retail and e-commerce customers." Amazon explained that Amazon FBA "stores your products" (*i.e.*, third parties' products) at its fulfillment centers or warehouses in much the same way that XPO Direct "warehouses and last mile hubs serve as flexible stockholding sites" for third parties' products. Amazon's website explained that it would ship "products to customers from our network of fulfillment centers" just as XPO Direct stated that sellers' "[t]ransportation needs are supported by [XPO's] brokered, contracted and owned" transportation services. Amazon also described on its website how sellers who used Amazon FBA enjoyed access to Amazon's free "Two Day Shipping" service that its "Prime members love."[6] XPO Direct similarly offered "broad North American footprint can position goods within two days' delivery of 95% of the U.S. population and in close proximity to retail stores for inventory replenishment."

73.    By creating a service that was "very similar, if not exactly like, Fulfillment by Amazon," XPO was taking on an Amazon business that, as evidenced by Amazon's public filings, was important to Amazon because it drove billions of dollars' worth of Amazon sales.[7]

74.    The Individual Defendants took more action in April 2018 that strengthened its ability to compete against Amazon. A day before it announced the launch of XPO Direct, the Company publicly announced in a press release on April 23, 2018 that it had recruited one of

---

[6]   Fulfillment by Amazon – Benefits, Amazon.com, https://web.archive.org/web/20180317230514/https://services.amazon.com/fulfillment-by-amazon/benefits.htm (last checked September 19, 2019).

[7]   According to Amazon's 2018 10-K, Amazon made net sales of $97.6 billion during 2016-18 on its third-party seller services that included Amazon's FBA's core features: "commissions and any related fulfillment and shipping fees, and other third-party seller services." These net sales grew as a percentage of Amazon's overall annual net sales over the same period from 25%, to 29% to 34%.

Amazon's top executives, Kenneth Wagers III ("Wagers"), to serve as XPO's new COO. XPO said that Wagers would oversee XPO's operations in 32 countries and that he would take over that role "effective immediately." Defendant Jacobs touted Wagers's "e-commerce" experience to XPO and lauded him as a prominent executive in the industry, "most recently with Amazon":

> Wagers' career in the supply chain sector includes senior positions with three global leaders: Amazon.com, Dr. Pepper Snapple Group and UPS. He was *most recently with Amazon*, where he had executive oversight of Amazon's Worldwide Transportation and Logistics business (last mile, middle mile, and air and ocean cargo), as well as Amazon China operations, Prime Now and Amazon Fresh operations.

75.     Given Amazon's famously competitive zeal, it was not surprising that Amazon was not happy about XPO's decisions to launch XPO Direct and hire Wagers away. Indeed, as a Deutsche Bank analyst who had access to private meetings with senior XPO management during the Relevant Period observed in a February 18, 2019 report, the recruitment of Wagers from Amazon involved "teams of lawyers on both sides." XPO ultimately won the recruiting battle, extending a substantial compensation package to Wagers.[8] XPO succeeded in securing a non-compete provision from Wagers, which effectively barred him from returning to work for Amazon for a certain number of years given XPO's decision to launch XPO Direct a day after hiring him. One industry source revealed that Amazon had asked XPO, in 2018, to "reconsider" its decision to recruit Wagers from Amazon.

76.     Regardless, it is clear that Amazon had already decided to stop doing business with XPO even before it decided to compete with one of Amazon's top businesses. As defendant Jacobs

---

[8]     According to an April 24, 2018 SEC Form 8-K ("8-K") that the Company filed with the SEC, Wagers served in senior positions at Amazon over the preceding five years and held senior positions at other companies before becoming a senior executive at Amazon. The report also stated that XPO management had agreed to pay Wagers a $525,000 base salary with a target bonus of another $525,000, a cash signing bonus of $285,000, and 105,000 shares of stock to vest in equal installments over ten years.

would admit later, the Individual Defendants knew that Amazon was not going to do business with XPO over the long term. This admission shows there was no single event in 2018 that prompted Amazon to leave XPO. Rather, Amazon's 2018 actions were consistent with the business plans that it had revealed to the Individual Defendants all along.

77.     For example, according to a February 20, 2019, online *FreightWaves.com* article, Amazon reportedly stated that it was "'ridiculous'" to say that Amazon would purposely attempt to injure XPO as "revenge" for hiring Wagers. Amazon's actions following XPO's announcements that it was going to compete with Amazon directly, however, do lead to the strong inference that XPO's competitive activities were at least an important factor that Amazon considered in determining *when* to leave XPO.

***Amazon Accelerates Its Wind Down of XPO Business***

78.     Amazon's response to XPO's actions was swift, resulting in the immediate curtailing of Amazon's business with XPO. There are several examples demonstrating that Amazon began acting on its plans to leave XPO sometime around April 2018.

79.     One such example was Amazon began shutting down its business with XPO at a fulfillment center that XPO ran for Amazon in the Kansas City area. Given its location in the middle of the United States and its transportation infrastructure, Kansas City is an important logistics hub. According to a March 1, 2019, *Logistics Management* article, one industry executive explained to the monthly publication that Kansas City's "'central location, highway and rail infrastructure as well as our air cargo capabilities allow us to reach 85% of the U.S. population in two days or less,'" and many "'companies such as Amazon, Jet.com, Overstock.com, CVS, Turn 5 and others have selected KC in the last few years to take advantage of this market reach.'" According to a January 29, 2019, article in the *Kansas City Business Journal*, this location served as the site of XPO's "Edgerton" fulfillment center that XPO ran for Amazon since 2016.

80.     A former XPO Edgerton warehouse employee ("FE-1") confirmed that the warehouse managed only Amazon business.[9] This former employee chose to leave XPO after observing "red flags," including the slowing down of in-bound Amazon merchandise, as well as a concurrent slowing down of outbound merchandise, neither of which he said boded well for the warehouse's prospects. According to FE-1, inbound and outbound Amazon activity definitely began declining around the end of March and/or beginning of April 2018. FE-1 said that in the May- July 2018 time frame, the amount of outbound goods being shipped to customers from Edgerton went from around 1,100–1,200 a day *to 750 units* a day. During the peak season, the amount of outbound goods could be as high as 2,800 units a day and even in January and February 2018 the daily shipments could be around *1,800 – 2,200* units a day.

81.     Another former XPO employee who worked at the Edgerton warehouse ("FE-2") explained that the Edgerton fulfillment center started slowing down in 2018. As early as April/May 2018, FE-2 began seeing warehouse racks that typically store Amazon goods "getting pretty empty."[10] And, according to FE-2, as 2018 went along, there were clear signs of activity at the center beginning to slow down. That the activity was not picking up in the July/August 2018 timeframe (or thereafter) was "not right" because this period was the beginning of the peak season months. Furthermore, by August/September 2018, which usually was the time when the inbound receiving personnel at the plant should have been getting busy as peak season got underway, these personnel sometimes had so little to do that they were reassigned to the shipping department so that they got enough hours to work. FE-2 suspected "something" had been "going on" with the

---

[9]    FE-1 worked at XPO as a PIT Operator, Order Picker Trainer, Put-Away Routing Specialist, and Receiving Dock Unloader from November 2017–July 2018.

[10]    FE-2 worked at XPO as a Pit Operator beginning in October 2017.

center, and believed the suspicion was confirmed by XPO's eventual announcement that it would close the Edgerton warehouse.

82.     Yet XPO waited until 2019 to announce the fact that it was closing the facility, and this triggered a requisite notice pursuant to the Worker Adjustment and Retraining Notification Act of 1988 ("WARN") that predictably led to press reports, like a January 29, 2019, article in the *Kansas City Business Journal* about XPO's closing the facility. The slowdown in business at XPO's Edgerton facility was a "red flag" to the Individual Defendants that Amazon was winding down the business it gave to XPO. More plausibly, it was a clear indication that Amazon began to wind down its business with XPO.

83.     Other witness accounts corroborate FE-1's and FE-2's observations, showing Amazon started to pull its business from XPO by the end of March or early April 2018. Specifically, in the first quarter of 2018 ("1Q18"), an Amazon Area Manager ("Amazon Manager") started seeing fewer XPO trailers at five different Amazon warehouses that he visited as part of his job. "When that happened all the XPO trailers disappeared from the yard," the Amazon Manager explained. The Amazon Manager elaborated, "that's when you noticed" the decline, "when there's 400 trailers sitting out there and you use to see XPO all the time and then all of a sudden there's none, you know it's an obvious sign."

84.     The Amazon Manager had previously worked for XPO and was in position to observe trends as a result of visits to the five different Amazon warehouses. These observations are consistent with the slowdown that FE-1 and FE-2 witnessed. Importantly, those two accounts related to XPO's "logistics" segment, while the Amazon Manager's accounts relate to XPO's "transportation" segment. Altogether, these facts demonstrate that Amazon was slowing the amount of business it gave to XPO in both of its major segments at about the same time.

85. Notwithstanding the warning signs that Amazon had started putting into motion its stated business plans of leaving XPO, in May 2018, the Individual Defendants *re-affirmed* the 2018 financial guidance that it had given on February 7, 2018. In a May 2, 2018, 8-K press release, presentation, and slides publicly filed with the SEC, XPO "reaffirmed both targets in [its] outlook: adjusted EBITDA of *at least $1.6 billion* for full year 2018, and 2017–2018 cumulative free cash flow of *approximately $1 billion*." Previously, on February 7, 2018, XPO reported in an 8-K that for "2018, [XPO] reaffirmed [its] target for adjusted EBITDA of at least $1.6 billion, and raised [its] 2017-2018 cumulative free cash flow target to approximately $1 billion, from approximately $900 million."

86. In other words, the Individual Defendants' 2018 financial guidance from May 2, 2018 (and repeated the next day) was exactly the same as the financial guidance that the Individual Defendants gave to the market on February 7, 2018. This guidance was false (or at the very least misleading) because it included Amazon projections that was inconsistent with the fact that Amazon was already reducing its use of XPO. The Amazon departure would have (and should have) changed projections in the ordinary course because, as defendant Jacobs admitted, XPO generated the numbers following a "bottoms up" process. Building forecasts in that manner necessarily would consider the Company's largest customer.

87. XPO's May 2, 2018 financial guidance was all the more misleading because defendant Jacobs had previously promised investors that he would let them know if there were any changes to the Company's internal numbers that would affect the Company's guidance. On February 8, 2018, Jacobs told analysts and investors during a conference call:

> So the way we get those numbers is *we do it bottoms up*. So we have every part of our organization, pressure test its best-case scenario, its worse-case scenario, its likely-case scenario, and we aggregate all that, and that comes to *$1.6 billion* or more of EBITDA in this year. *So we're sharing with you the same internal numbers*

*that we have, and those are the numbers*. We feel very good about growing EBITDA another 17% in 2018 over 2016 (sic) [2017], and we feel very good about generating about $1 billion of free cash flow over 2017 and 2018, and *those are the numbers that we internally have. If, for some reason, those change over the course of year, we'll let you know that when they change*. But we're not going to change them just because people want us to change them. Those are the numbers, and they're really good ones.

88.     Unfortunately for the Company, between February 2018, when Jacobs discussed XPO's 2018 guidance, and May 2, 2018, when the Individual Defendants' reaffirmed XPO's guidance, the risks of Amazon taking business away from XPO already started to materialize due to XPO's recruitment of Wagers away from Amazon and the Company's launch of XPO Direct. Defendant Jacobs could have easily conveyed this information to investors at the time and made appropriate adjustments to the Company's growth plans.

89.     Instead, when XPO held a conference call with analysts and investors on May 3, 2018, defendant Jacobs reaffirmed XPO's full-year guidance, and worse, told investors that there was *no reason* to think the business would slow relative to what XPO management had planned in February 2018. Defendant Jacobs's reassurances assumed that Amazon would *not* start pulling business at any point in 2018 when the opposite was true:

> [Deutsche Bank analyst:] *[I]s there any kind of reason to think the revenue and EBITDA growth* of the business is actually very strong, not even just the 11% or the 10.4% you did last quarter, but really kind of even within that high single-digit framework that you provided. *Is there any reason to think kind of that type of revenue growth and EBITDA growth that you're achieving even this year slows*? If you can just help us think about that as you look at the pipeline of new business, because that is kind of top of mind right now, especially in the transportation segment?

> [Jacobs:] *Sure. There is no reason to think it's going to slow*, and I don't know that we're in any better position than everyone else to predict what the economy is going to do over the next few years So for the time being and for the foreseeable future, absent some geopolitical events, *life looks good, at least from our point of view just looking at our customers and seeing what our customers are doing and saying*.

90.     This statement was materially misleading at the time because Amazon's actions demonstrated that it had started to act on its previously-stated intention to stop doing business with XPO. Amazon was XPO's largest customer, but, as the entire world knew at the time (including defendant Jacobs), Amazon also represented one of the most important players in the e-commerce market as a whole. No reasonable executive in Jacobs's shoes could have believed there was "*no reason*" to think the Company would not meet the revenue and earnings growth that XPO had planned at the beginning of the year, given that: (1) XPO internally *projected* Amazon would generate over $950 million in revenue for 2018 in February 2018; (2) Amazon's stated business plans were to cease using XPO over the long term; and (3) Amazon started to wind down its use of XPO in the March/April 2018 time frame. As the Individual Defendants knew or should have known, these conditions meant that XPO was losing its most important customer and a business partner that gave XPO access to the e-commerce market.

91.     The Individual Defendants' ruse worked, however, as analysts rejoiced after the Individual Defendants: (1) reaffirmed XPO's full year guidance and (2) emphasized that XPO remained confident in its guidance despite starting to compete against Amazon.

92.     For example, in a May 4, 2018 report, Morgan Stanley credited defendant Jacobs's comments that "life looks good" with regard to XPO's projected earnings and revenue growth, explaining that:

> We see little to no threat of new entrants being able to make a mark quickly in the last mile space despite recent headlines and we believe CL [contract logistics] remains one of the last businesses to be 'Amazon-ized' as XPO's large retail and industrial customers are likely unwilling to hand over their entire supply chains to AMZN to control.

In that same report, Morgan Stanley also credited XPO's story that its customers kept giving XPO positive reviews to the Company in the wake of its Amazon-related announcements, and

reaffirmed its price targets on the present value of increasing earnings, showing that "[o]ur 2018-2020 EBITDA estimates are relatively unchanged at $1.6 bn, $1.8 bn, and $2.0 bn, respectively, and our PT stays at $125."

93.     Moreover, to the extent that any investors had any concerns about XPO's relationship with Amazon, defendant Jacobs reassured them that they had nothing to worry about. On or around May 9, 2018, defendant Jacobs appeared on the *CNBC* television show "Mad Money" hosted by Jim Cramer ("Cramer") to that end. Cramer noted how XPO and Amazon had recently "blown away the numbers" and that XPO and Amazon were "synergistic" in some ways. Jacobs responded:

> [Jacobs:] Amazon's growing so much faster than we are. We're proud that we grew 11% (organically) in the first quarter, so compared to other transportation companies, we're at the top. Amazon grew 45%.
>
> [Cramer:] That's true.
>
> [Jacobs:] They are twice the size of themselves every two years.
>
> [Cramer:] But you play a big role in trying to get bigger . . . packages to people[] everywhere.
>
> [Jacobs:] Absolutely. And we have Amazon as *a customer* and we have *many other ecommerce players* as a customer. We're *facilitating their growth*.

94.     Between May 3, 2018 and May 8, 2018, the market responded favorably to XPO's many assurances. On May 3, 2018, defendant Jacobs told the market before it opened that he had no reason to think the Company's outlook would change and that "life looks good" based upon what its customers were saying and doing, which, as he knew, or should have known, included its biggest customer Amazon.

95.     Yet the Individual Defendants knew that the new XPO Direct business could not come even close to replacing the business that XPO was losing and would keep losing from Amazon.

96.    The Individual Defendants leaked this fact in a private meeting with analysts from Deutsche Bank. Deutsche Bank then issued a public report after the meeting, commenting in a July 19, 2018 report that XPO "expected [XPO Direct] to be a $1B revenue business in a 'few years'— from $0 last year." This demonstrates that the Individual Defendants understood that any new revenue from XPO Direct could not offset the lost revenue from Amazon in the short term. XPO's declining tonnage numbers showed the same thing.

***The Individual Defendants Tell Investors That "Nothing Has Slowed Down" Despite Knowing XPO's Top Customer Had "Slowed Down"***

97.    XPO historically tracked "tonnage" or the amount of weight shipped by its transportation segment as an important metric that helped the Company determine how to allocate resources and also to determine underlying operating growth trends. Defendants Jacobs reviewed tonnage reports in the ordinary course of business and reported tonnage statistics to investors during the Relevant Period.

98.    The tonnage reports are not customer specific, but when tonnage numbers are down, District Managers could reach out to the sales department to learn why the numbers dipped and what could be done to reverse this decline. XPO sales reports would break down tonnage on a per-customer basis. Employees at the Director level and above had access to sales reports, but it was easier for a District Manager to simply call a sales director to ascertain what was generating lower tonnage numbers. XPO had Quarterly Business Reviews ("QBRs") where the Director of Operations and Director of Sales would present their regional numbers. Defendant Jacobs attended these meetings from time to time.

99.    Moreover, according to a February 14, 2018 letter from XPO to the SEC, defendant Jacobs conducted one-on-one weekly meetings with the head of the transportation segment during the Relevant Period, and such meetings included discussions about "customers won, lost" and

potential new customers. Such discussions clearly would have covered negative developments with the Company's largest customer, Amazon.

100.    The tonnage and sales reports show Amazon's decision to leave XPO continued to impact XPO during the May/June 2018 period, as facts provided by a former XPO employee ("FE-3") demonstrate. FE-3 had a role in selling XPO's services to other businesses during this time frame.[11] While still employed by XPO, FE-3 heard "that Amazon left." Shortly before FE-3 left XPO in summer 2018, FE-3 and others received a "tonnage report" showing "tonnage" was down in various territories and regions *because of a drop in tonnage from Amazon*. FE-3's team was asked to try to replace some of that business by selling more tonnage to other customers. FE-3 did not believe that Amazon had fully left prior to FE-3's review of the tonnage reports (shortly before June 2018), but recalled that Amazon had gradually started to slow down its business with XPO.

101.    The Amazon Manager referenced above, *see* ¶62, who served in that role during the Class Period, also witnessed events consistent with FE-3's recollection. The Amazon Manager worked in the LTL side of the transportation business, corresponding to XPO's LTL business line in its transportation segment. The term "LTL" refers to "less-than-truckload," and is a common business term in the freight business. XPO explains in its SEC filings that LTL refers to the transportation of a quantity of freight that is larger than a parcel, but too small to require an entire truck, and is often shipped on a pallet. It further explains that an LTL carrier typically operates a hub-and-spoke network that allows for the consolidation of multiple shipments in different trucks. Consistent with XPO's LTL description, the Amazon Manager explained that XPO had been

---

[11] FE-3 was an Account Executive in XPO's sales division for a number of years leading up to May 2018.

transporting Amazon merchandise between Amazons fulfillment centers and also delivered LTL deliveries to Amazon retail customers.

102.    The Amazon Manager explained that Amazon "dropped" the XPO LTL business prior to summer 2018. In 1Q18 or 2Q18, the Amazon Manager recalled reading a story on an internal Amazon intranet newsletter that related to XPO. The internal Amazon newsletter stated that Amazon was dropping XPO LTL. This information is significant because it corroborates FE-3's accounts about "tonnage" reports, which measure LTL shipments.

103.    Public admissions further demonstrate that XPO did in fact track LTL "tonnage," that senior management reviewed (and reported) LTL "tonnage" figures, and that tonnage was going down.

104.    Unfortunately, the Individual Defendants chose to mislead the market about *why* those tonnage trends had changed. In the time period leading up to May/June 2018, XPO reported tonnage figures that were consistently increasing throughout the 2017 period then started to decline in the quarter ending March 2018 (by 1.1%) and continued falling throughout 2018 at levels that are material when compared to the tonnage growth levels that XPO enjoyed while its business with Amazon grew in 2017. The increasing figures in 2017 are consistent with defendant Jacobs's later admissions that Amazon grew XPO "a lot" during this time frame and are consistent with the tonnage reports demonstrating that Amazon (by itself) could materially affect the amount of tonnage that XPO managed on a Company-wide basis. The declining figures in 2018 are consistent with FE-3's and the Amazon Manager's accounts that Amazon had started to leave XPO in the first or second quarters of 2018.[12]

---

[12]    The tonnage statistics increased in daily tonnage throughout 2017: +4.8% (1Q17); +7.1% (2Q17): +5.6% (3Q17): and +2.9% (4Q17). Then, in 2018, they started declining throughout the

105.     Reports that Amazon was reducing its use of XPO during the first half of 2018 are consistent with other examples of how that decision unfolded at particular warehouse facilities that were dedicated to serving only Amazon. Thus, the Individual Defendants could not have been confused at the time about whether it was Amazon or some other customer lowering its business with XPO. One of those warehouses served Amazon's end customers in Baltimore, Maryland and was known internally as the "AZM" warehouse. Another former XPO employee who worked at the AZM warehouse as a planning analyst between the spring of 2017 and the fall of 2018 ("FE-4"), knew by June 2018 that Amazon was leaving. FE-4 also saw a June 2018 email from Jeffrey Kenyon ("Kenyon"), XPO's Vice President of Supply, to Thomas Matte ("Matte"), the Director of AZM, stating as much.

106.     FE-4 recalled that Kenyon's June 2018 email indicated that the Amazon contract was ending in September 2018, and that local management should not let any of the other employees know about it. FE-4 further recounted how it was "exactly" right to understand the email in substance to mean that XPO was losing Amazon and "they knew it," referring to XPO management. The June 2018 email from Kenyon indicated that management would try to get an extension, but this was a problem because, as FE-4 understood the email, it meant that XPO was not going to get a multi-year renewal of the business. Although FE-4 could not recall the length of the extension, FE-4 did explain, "[i]t just said we are going to get an extension and don't worry about it, I don't know when the 6-month term actually came up, I actually personally thought they were only going to get 3 months . . . *it just said we are going to get an extension and we're going*

_____

year relative to 2017, as the Company reports statistics based on a year-over-year changes: -1.1% (1Q18); -0.6% (2Q18); -1.5% (3Q18); -1.1% (4Q18).

*to wind down the warehouse*." Kenyon's June 2018 email told Matte not to inform other employees about the fact that Amazon was leaving—not to "panic" the employees.

107.    The substance of the June 2018 email from Kenyon to Matte is consistent with the actions that Amazon took at the Baltimore AZM fulfillment center around that time. Around June 2018, FE-4 explained that the number of trucks delivering Amazon packages inbound to the AZM warehouse fell from about twelve full tractor trailers per day to about three or four per day. The daily number of units that XPO processed inside of the facility fell from the usual 5,000-6,000 to about 2,000 per day. During that same time, inventory dwindled to 46%. According to FE-4, "[t]hat's not normal for a warehouse that usually should be 80% to 90% stocked, and it kept getting worse," down to 40% by September 2018. The department that received in-bound Amazon packages dropped from 21 to 10 employees in June 2018. "Something's wrong here," FE-4 explained, "*it's kind of like you walk into a store and the shelves are half empty*."

108.    As another example, during the peak "Amazon Prime" season in July 2017, AZM processed approximately 11,000 to 12,000 packages per day, but during the next Prime season in July 2018, that number dropped by approximately two-thirds (*i.e.*, to 4,000), according to FE-4. When lower-level employees asked questions about whether Amazon was going to renew its contract with AZM, management told them it was going to get a renewal, knowing that XPO was only going to get a short extension as the June 2018 email and related actions demonstrated.

109.    Another former XPO employee who worked at the AZM fulfillment center between spring and fall 2018 ("FE-5") corroborated FE-4's account of events at that center. FE-5 observed that there "wasn't much work coming in" to the facility during the summer of 2018 and that the number of products to "pick" for outbound delivery was getting "lower and lower" during this time.

110. In April 2018, FE-5 worked around 40 hours per week (plus overtime) but, by August 2018, FE-5's hours were reduced to 32 hours per week with no overtime. Consistent with FE-4, this former employee (*i.e.*, FE-5) also left XPO in fall 2018 because there was not enough work. FE-5 similarly heard that Amazon was going to end its contract with XPO.

111. Consistent with FE-4's account that Amazon was not going to renew its multi-year contract in September 2018—and only gave XPO an extension lasting a period of three or six months to wind down the business—XPO provided employees a legally-required thirty day WARN notice in January 2019. The press picked up on that event and reported it.

112. As the *Baltimore Sun* reported in a January 29, 2019 article entitled, "XPO Logistics will close Harford County warehouse in March," XPO would close the 571,000 square foot warehouse "by the end of March [2019], a company spokesperson confirmed"—that is, six months after September 2018, reflecting the six-month extension to the multi-year contract that Amazon told XPO it was not going to renew. Amazon acted on its decision not to renew its multi-year contract ending on September 31, 2018, telling XPO in June 2018 (at the latest) and beginning to act on that decision soon after.

113. Amazon took similar actions at other XPO fulfillment centers. FE-4 explained that XPO managed another fulfillment center in Texas for Amazon that XPO called "AZT." That facility also began to wind down operations in the summer of 2018 with XPO providing a WARN notice of mass layoffs in August 2018 in advance of closing in October 2018.

114. The warehouses were part of a program that Amazon developed with XPO whereby XPO would provide warehousing and logistics support to help fulfill Amazon orders. Accounts by former employees about the Edgerton, Aberdeen, and Texas facilities demonstrate that Amazon was systematically lowering the amount of business that it did with XPO in 2018. These reports

relate to the "logistics" side of XPO's business and are consistent with accounts about declining Amazon tonnage numbers on the other side of XPO's business—the "transportation" business.

115.    In short, by the end of the summer 2018, there was little doubt that the Individual Defendants knew, or should have known, that Amazon was indeed acting on its stated business plan to leave XPO. Despite this understanding, on August 2, 2018, the Individual Defendants reported XPO's quarterly results and *reaffirmed* its full-year guidance of $1.6 billion in earnings and $1 billion in free cash flow. The Individual Defendants' reaffirmations did not stem from any new growth initiatives XPO had implemented to forestall the Amazon-related decline, as XPO had no such plan.

116.    The Individual Defendants gave these assurances to the market as the severity of XPO's tonnage statistics worsened in real terms (down 0.6% on the quarter) and relative terms (7.7% worse than the same quarter the prior year), and as its logistics relationship with Amazon continued to deteriorate, as evidenced by the drop in units shipped at the Aberdeen warehouse during Amazon Prime week in July 2018 to about 4,000 units per day from 11,000 to 12,000 units per day during Amazon Prime week in July 2017 and the stall at the Edgerton facility at the same time. These circumstances unfolded while Amazon—as defendant Jacobs noted on "Mad Money"—continued its historic growth surge.

117.    The juxtaposition of Amazon's explosive growth against Amazon's declining business interest in XPO is telling. Instead of simply explaining to the market that Amazon was lowering its business with XPO pursuant to Amazon's stated business plans, and that XPO was working hard to make up the slack, defendant Jacobs told analysts and investors during a conference call hosted by the Company on August 2, 2018, that XPO's "focus is not on tonnage growth" but on "selecting the right tonnage that matches our network and deselecting freight that

doesn't match our network and to get the right price, the right yield for the premium service that we provide."

118.    During the August 2, 2018 conference call, defendant Jacobs stated in response to an analyst question that he "would not guide you to expecting some big tonnage increase" because "it's not what we're trying to do. We're trying to get the right mix of tonnage." Defendant Jacobs's assurance is misleading at best because a material concentration of the tonnage decline flowed from Amazon's declining business and XPO clearly was not "trying" to lose that business for any reason. XPO was doing everything it could, internally, to make up for the lost Amazon tonnage but simply failed to do so because Amazon was too large to replace.

119.    This conference call was defendant Hardig's last. XPO announced his abrupt departure the day before this call and gave no explanation whatsoever as to why Hardig was resigning without any notice. XPO had no permanent CFO to replace Hardig at the time and therefore appointed another employee to serve on an interim basis.

120.    Hardig's resignation—the Company could not even feign he was "retiring"—was surprising at the time, but was not considered disruptive at the time considering the strong assurances that defendant Jacobs gave on August 2, 2018, that the Company was on track to make all of its financial targets for 2018.

121.    In response to analyst questions, defendant Jacobs reaffirmed and reassured investors that nothing had changed with respect to the Company's 2018 financial guidance:

> [Citigroup analyst:] In terms of revenue [growth of 11% referenced in the analyst's prior question], does it feel like a decent run rate to think about for the back half. Just trying to get a sense of how that looks?
>
> [Jacobs:] Yes, in this range. We've always been saying for the last few months, high single digits, low-double digits and *nothing's slowed down at all in terms of that guidance*.

122.    Defendant Jacobs's statement that nothing was slowing down "*at all*" in terms of the Company's historical and projected revenue growth was materially false and/or misleading at the time because it masked the fact that Amazon's use of XPO, a key part of XPO's growth engine, was, in fact, slowing down. By the time he made that statement, Amazon had already started to wind down its business affairs with XPO. Tonnage reports in XPO's transportation business showed declines that reflected Amazon starting to act on its stated plans to stop doing business with XPO.

123.    Contemporaneously, Amazon started shutting down warehousing and logistics support business that it gave to XPO's logistics segment. These activities are more than "nothing" in terms of the financial effects on XPO and were highly material, *particularly* in light of Amazon's stated long-term business plans. The Amazon decline also started around the time that XPO launched competing services and recruited one of Amazon's top executives to run the Company. Moreover, Amazon's declining business with XPO occurred while Amazon continued its meteoric growth, demonstrating that Amazon was not experiencing any larger business problems that would lower its ability to pay for XPO's services. It simply was not true, as defendant Jacobs said, that "*nothing's slowed down at all*" with respect to the Company's revenue growth and resulting revenue projections.

124.    Defendant Jacobs made similarly false and/or misleading statements on the same August 2, 2018, earnings conference call about XPO's earnings and cash flow position. At the time, XPO's cash flow outlook for 2017-2018 was that it would generate "approximately $1 billion." That meant the Company would generate approximately $625 million in free cash flow for 2018 because it had generated $375 million in free cash flow the prior year. XPO's EBITDA outlook was "at least $1.6 billion" for 2018. Defendant Jacobs had previously told the market that

these figures were the same as the Company's internal numbers and that he would let the market

know if anything changed. Rather than admitting the Company's problems with Amazon,

defendant Jacobs pretended they did not exist and instead reaffirmed XPO's full-year guidance

during the Company's conference call on August 2, 2018:

> [Deutsche Bank analyst:] Just want to understand is kind of the 17% or mid-teens type *EBITDA growth* that *you're posting this year sustainable in your view*, as you look *through '19 and '20, given the book of business* and then, does the CapEx intensity change at all. I think you're running about 2.8% of sales this year. Does that actually go down as the sales growth, or should we expect that to kind of move up, given some of the initiatives that you're accelerating?

> [Jacobs:] Sure. So let's do all 3 lines. Let's do organic *revenue growth, let's do EBITDA growth, let's go free cash flow/CapEx* since they're related to each other. On the sales side, on the *revenue growth side*, very buoyant, that's partly because it's a good economy, it's a good market. It's partly because we're doing a lot of company-specific things in terms of operational excellence, in terms of hitting on all 8 cylinders that customers are rewarding us with our greater-than-fair share of their wallet. So I expect that organic revenue growth is going to stay in this high level, high single digits, low-double digits for the foreseeable future. *I don't see any slowing down on that*. EBITDA, we haven't done a bottoms-up budget yet at all, that process is just starting. On a preliminary basis, yes, I think something in the *15% to 18% range is very reasonable* to assume for continued *EBITDA growth* for the foreseeable future.

> In terms of free cash flow, we will generate more free cash flow next year than we did this year, even though we've generated very substantial amount of free cash flow this year. And this year we'll have about 70-something percent more free cash flow than last year. I don't think it's going to be 70% more, because I think there's going to be more opportunities for deploying CapEx, but it's way too early in this year to be giving specific guidance for CapEx for next year. But I can tell you this: last week, we had about 45 of our top executives in for 3 days for quarterly operating review. People are confident in their business. Peoples' customers are confident in their business.

125.   Here, as before, Jacobs reassured the market "*I don't see any slowing down*" on the

Company's revenue growth, and similarly told the market that that 15%-18% EBITDA was

reasonable, which was significant at the time because XPO had reported 18% growth in the first

quarter of the year, but lower growth of 16% growth in the second quarter of the year as Amazon

continued to act on its "stated business plans," which, as Jacobs knew, meant Amazon business "was going to come to an end." Defendant Jacobs's EBITDA statement—that it was "very reasonable to assume" 16%-18% earnings growth for the foreseeable future—was materially false or misleading at the time for these and other reasons underlying Amazon's declining business with XPO.

126.     Jacobs's assertions that XPO would generate even "more free cash flow" in 2019 as compared to 2018 and that "we'll have about 70-something percent more free cash flow [this year, 2018] than last year" were both false and misleading for similar reasons. Jacobs knew that his guidance was misleading because it assumed that Amazon's business would continue growing XPO as it had over the past few years even though he knew or was reckless in not knowing that Amazon's business with XPO was "going to come to an end" and that Amazon's wind down process had already begun.

***Amazon Continues to Wind Down Its Business with XPO During Amazon's Mission-Critical Summer of 2018 "Prime Week" as XPO's Chief Financial Officer Resigns***

127.     Amazon's wind down of its business with XPO continued into 3Q18, as evidenced, in part, by even lower tonnage statistics and stark examples of Amazon's pull-back in the logistics business it gave to XPO. Amazon's decision to cut its "Amazon Prime" week business with XPO during July 2018 is a good example. That week has strategic importance to Amazon.

128.     Amazon shared business from that event with XPO in 2017, as reflected in XPO's favorable third quarter rising tonnage statistics of 5.6% (year-over-year) and unit shipments of some 11,000 to 12,000 per day at the Aberdeen warehouse. 3Q18 comparable statistics showed daily tonnage fall by 1.5% (year-over-year) and unit shipments out of Aberdeen fall by approximately 64%-67% (year-over-year) alongside similar declines in in-bound Amazon deliveries and inventory. Qualitative facts show that other Amazon-related warehouses

experienced similar declines during the summer and fall of 2018 (3Q18, *i.e.*, from July to September) as noted above. XPO always knew that the Amazon business was "going to come to an end," as Jacobs later admitted and XPO continued to see the business actually "com[ing] to an end" in the 3Q18.

129.    On October 31, 2018, as Amazon's slowdown continued to affect XPO's operations, yet another senior XPO executive quit. Before the summer of 2018, typically a trio of executives—defendants Jacobs, Hardig and Malat—made reports to investors on quarterly conference calls and elsewhere. Defendant Hardig resigned at the end of the second quarter, as noted above. In the Fall of 2018, defendant Malat also decided to quit. Defendants Hardig and Malat quit just before the Company announced 2Q18 and 3Q18 results, respectively, meaning that Defendants Hardig and Malat quit right around the time that they were working with defendant Jacobs to determine what they were going to tell the market about those quarters and related financial guidance for the rest of the year.

130.    Defendant Malat's departure came as a shock to many in the market. Barclays commented in a November 2, 2018 report that "[t]he sudden and unexpected departure of Scott Malat, XPO's Chief Strategy Officer, did come as a shock to many in the market, especially following the recent departure of CFO John Hardig this summer."

***Feeling the Effects of Amazon's Departure, The Individual Defendants Misleadingly Blame a "Rounding Error" UK Customer for "Missing" Third Quarter Financial Targets - and XPO's Chief Strategy Officer Resigns***

131.    On October 31, 2018, XPO also reported that it had missed 3Q18 earnings and revenue expectations and blamed the miss on one single customer, a department store in the United Kingdom (*i.e.*, House of Fraser). XPO had repeatedly given annual revenue, earnings, and cash flow guidance to the market, which analysts then modeled and broke down into quarterly consensus estimates that they published. For 3Q18, consensus adjusted earnings per share

estimates were $0.98 per share and the consensus revenue estimates were $4.401 billion. As a November 2, 2018 research firm Stephens Inc. ("Stephens") reported that XPO reported $0.89 adjusted earnings per share and revenue of $4.335 billion, missing its consensus estimates in both categories. XPO also reported free cash flow[13] of $173 million, which, according to a November 4, 2018, analyst report by Credit Suisse, missed free cash flow estimates of $242 million for the quarter.

132.    XPO's 3Q18 financial "misses" gave management yet another opportunity to tell the Company's investors that Amazon had started acting on its stated business plans to take its considerable business away from XPO. But management did no such thing. XPO blamed that quarter's operational issues (as reflected in the misses) on a much smaller customer. The Individual Defendants lowered the Company's earnings guidance for that purported reason alone, but reaffirmed its 2018 free cash flow guidance, as defendant Jacobs told investors on a November 1, 2018 earnings call:

> We generated [third quarter 2018] adjusted EBITDA of $415 million despite a $16 million headwind from a customer bankruptcy in Europe.
>
> *       *       *
>
> We've updated our full year 2018 target for adjusted EBITDA to approximately $1.585 billion. The revised target reflects the impact of the customer bankruptcy I mentioned earlier. And we've reaffirmed our target for approximately $1 billion of cumulative free cash flow over 2017 and '18.
>
> Given our strategic positioning, we expect to continue to outpace the market in any macro environment, and we're looking at some exciting opportunities to accelerate that growth through acquisitions. Now, as you saw from yesterday's release, Scott [Malat] will be leaving us in December.

---

[13]    According to an October 31, 2018 8-K filed by the Company, XPO calculated free cash flow by taking its cash flow provided by operating activities, subtracting payment for purchases of property and equipment, and then adding proceeds from the sale of assets.

133.    Analysts asked Jacobs to elaborate on the customer bankruptcy that purportedly caused XPO to miss third quarter guidance and to take down adjusted EBITDA for the year:

> [KeyBanc analyst:] I guess, just maybe a housekeeping one to start. Brad [Jacobs], do you have—what is the annual EBITDA run rate from the customer bankruptcy that happened here in the quarter?

> [Jacobs:] It was mid–low single-digit millions EBITDA.

> [KeyBanc analyst:] On a full year basis, it was a low single digits of EBITDA?

> [Jacobs:] Yes, which is—which still really bothered us because here, we are, making low-single-digit millions in EBITDA, and we let our heart get ahead of our mind in trying to support a customer and ended up writing-off $16 million. But c'est la vie.

> [KeyBanc analyst:] Okay. Got it. And then—so we think about the growth rates going forward though it's not a huge comp to overcome that on an annual basis?

> [Jacobs:] It's a rounding error, but it made us miss the quarter, which is something we work really hard not to do. So on a long-term basis, it's really just—it's nothing. It's a few million bucks.

134.    Defendant Jacobs's comments reassured analysts that the UK customer (House of Fraser) issue presented no systemic issues to the Company. For example, in a November 1, 2018, report, J.P. Morgan noted that the Company provided "[a]dditional context on customer bankruptcy and risk controls in logistics. The bankruptcy at House of Fraser cut $15.6mm from adjusted EBITDA in 3Q18 and brought down the full year guide, but we do not believe this event is a signal of a systemic risk." The fact that defendant Jacobs reaffirmed full-year 2018 cash flow guidance was understood by analysts to mean that XPO was on track to a blockbuster fourth quarter because the incremental $410 million that XPO needed to generate to meet its full-year free cash flow guidance was about $40 million higher than it had generated over the entire 2017 calendar year and represented a 128% increase as compared to the fourth quarter's free cash flow in 2017.

135.    The size of the increase prompted some investor questions, as Stephens noted in a November 2, 2018 report that "XPO's 3Q18 results raised more questions in investors minds than it answered." The same analyst asked, "if XPO has managed its earnings all year by reinvesting excess profits" back into the business "so that it would earn '*at least*' $1.6 bil., *why does a relatively small write- off cause the Company to adjust guidance lower*?"

136.    In retrospect, the short answer to that question is "it doesn't," and the Individual Defendants knew it, or at the very least should have known, at the time. By the time that defendant Jacobs blamed the third quarter miss on the House of Fraser's bankruptcy, Amazon, the largest e-commerce company in the history of the world (and XPO's largest customer) had taken material steps to exit its business relationship with XPO. It was *that* change in business conditions that caused XPO to miss its 3Q18 consensus earnings expectations, which analysts calculated on the basis of XPO's earnings guidance for the 2018 calendar year. The guidance was for "*at least* $1.6 billion" showing, as the Stephens analyst suggested, that XPO had budgeted for earnings in excess of the $1.6 billion level. But by 3Q18, that cushion had diminished as Amazon started to wind down its business relationship with XPO. Because that business was on the decline, all it took was a "rounding error" customer (in Jacobs's words) to trigger the third quarter miss.

137.    Traces of Amazon's effect on XPO's 3Q18 appear in particular admissions that defendant Malat made during the third quarter earnings call:

> [Malat:] Our LTL *tonnage declined 1.5% due to our decision* to selectively target more profitable freight, partially offset by a 3% volume increase in higher-margin local freight. We were able to further reduce our purchased transportation costs by increasing utilization of our owned trucks to offset inflation. Purchased transportation made up 26% of our linehaul miles in the quarter versus 33% from a year ago.

138.    Defendant Jacobs made a similar statement in response to an analyst's question about the Company's ability to grow revenue:

[Jacobs:] Tonnage was down, though. *Tonnage was down 1.5%*, which is *in-line with recent quarters* and consistent with *our strategy* of selectively targeting the more—the freight that fits our network the best, more profitable freight. And you mentioned the investment in the local sales force. I'm very happy that we did that. And the proof's in the pudding, where our *local tonnage was up 3%* in the third quarter.

139.    Defendants Jacobs's and Malat's reports that tonnage was continuing to decline on a company-wide basis but that "local" tonnage had increased, means that whatever additional tonnage XPO was shipping with local accounts was not sufficient to offset the tonnage that XPO lost from its largest national account—Amazon. The idea that XPO *wanted* to lower the tonnage that it shipped raised questions on the 3Q18 conference call. An analyst pointed out that such a choice made little sense given favorable margins in that business:

[BofA Merrill Lynch analyst:] So just—I wanted to say on the—this LTL point, you mentioned the strong incremental margins in that space. And I'm wondering, you've gone—you've had the strategy for a long-term of kind of calling customer accounts and focusing on more regional freight, but *given the strong incremental margins, would it make sense strategically to maybe be looking to grow that business a little bit more aggressively?* And *not seeing, kind of, the declines in shipments and tonnage that we've been seeing?*

[Malat:] Absolutely. That's one of the reasons why we added to our local account executive sales force. We added over 200 sales and sales support to grow the business.

140.    This response is consistent with the events that a sales executive recounted occurring sometime in the May/June 2018 timeframe, when tonnage was down due to the "gradual" decline in Amazon business, giving XPO the chance to call smaller accounts to make up the difference. But Defendants Jacobs's and Malat's statements about the reasons why tonnage was declining were misleading because, as they knew, or should have known, Amazon decreased the amount of tonnage it shipped with XPO in a gradual way as it acted on its stated plans to discontinue its business with XPO. Amazon was too big to replace in 2018, and rather than simply telling investors that Amazon was in the process of discontinuing its business with XPO, the

Individual Defendants chose to blame a UK "rounding error" customer (House of Fraser) for its diminished financial performance and then claimed XPO *wanted* tonnage to decline in the manner that it did.

141.    Amazon also significantly lowered the logistics-related business that it gave to XPO during the 3Q18, as its decision to wind down and then shut down operations at several XPO warehouses demonstrates. "Amazon Prime" week occurred during 3Q18, but Amazon did not make the outstanding contributions to XPO's logistics business in 2018 that it made in 2017. The material decline in units received and then shipped out of the XPO warehouses dedicated to Amazon translated to lower revenue, earnings, and cash flow for the quarter.

142.    As a result, XPO's SEC Form 10-Q ("10-Q") for 3Q18 reported a significant drop in logistics operating revenue from $67.3 million in 2017 to $59.5 million in 2018—an 11.59% decline, year-over-year. These declining figures reflected Amazon acting on its decision to leave XPO as demonstrated by Amazon's actions in lowering the amount of logistics business that it did with XPO.

143.    Declining financial performance in XPO's logistics segment, like the tonnage statistics in transportation, clearly showed the Individual Defendants that they needed to tell investors that Amazon was acting on its stated business plans to leave XPO. But again, XPO blamed the UK customer for its lackluster *logistics* performance in 3Q18, as Malat said:

> Our operating income for logistics globally was $60 million compared with $67 million a year ago, and our adjusted EBITDA was flat. These results reflect the bankruptcy charge from *the one large customer [House of Fraser] Brad referenced earlier*.

144.    Defendant Jacobs refuted defendant Malat's "large customer" characterization later in the call by referring to that customer as simply a "rounding error" to XPO. Defendant Jacobs

also blamed this one "rounding error" customer for XPO's problems in the quarter, leading to his conclusion that "*it made [XPO] miss the quarter.*"

145.    The misleading nature of that statement and others blaming House of Fraser for XPO's 3Q18 miss grows in light of the fact that Amazon's third quarter contributions to XPO's revenue would have translated into higher earnings and free cash flow as compared to the rest of XPO's book of business. Defendant Malat's replacement as the Company's CSO later admitted this fact during a February 15, 2019 earnings call, explaining that Amazon's earnings margins were "slightly *higher than company average* EBITDA margin" at XPO. In other words, the revenue that XPO was starting to lose from Amazon had larger, negative effects on XPO's earnings and free cash flow on a relative basis.

146.    Comparing the relatively inconsequential nature of House of Fraser with Amazon's importance to XPO's overall business further demonstrates that defendants Jacobs and Malat misled investors about the reasons XPO missed its 3Q18 financial targets. These Defendants did not want to mention Amazon because reasonable investors and analysts obviously would have asked similar questions on the conference call about *that* customer. Further, because XPO could not have credibly labeled Amazon as a "rounding error," they chose to mislead investors by blaming the miss entirely on a relatively unimportant customer.

147.    Because Amazon was already acting on its stated plan to bring its business relationship with XPO to an end, it was just a matter of time before XPO ran out of scapegoats to blame for the gaping revenue, earnings, and cash flow hole that would deepen as Amazon took more of its business away from XPO during the fourth quarter of 2018 ("4Q18"). To conceal that problem, defendant Jacobs reintroduced XPO's plans to buy another company that was at least as big as XPO, which would allow XPO to consolidate the two companies' financial statements for

2018 and make it very difficult (if not impossible) to see the toll that Amazon took on XPO as a stand-alone company. Jacobs put XPO's M&A plans back on the table on the November 1, 2018 call:

> [Jacobs:] The [M&A candidates] that we've got shortlisted right now, and we—if you recall, we shortlisted that from hundreds and hundreds of the ones that we looked at over the process—I like them all. I mean, they're all really good deals. You just got to get the right price and the right terms. And we also have to have a willing seller. So as soon as the stars line up on those scores, we'll do the deal, but it's not like, we're revisiting the whole list of one's that we rejected.
>
> [BofA Merrill Lynch analyst:] Got it. But it's safe to say that you guys have *actively engaged* all of the people on that list in some form of dialogue?
>
> Is that correct?
>
> [Jacobs:] Correct. That's correct.

148.    Defendant Jacobs's renewed interest in completing an M&A transaction sparked analyst interest following the call.

149.    On the same day as the call, J.P. Morgan analysts reported: "M&A back on the table as topic of discussion. With strong organic growth, XPO's M&A strategy was put to the backburner as valuations did not meet expectations. Following the recent pullback, however, XPO has re-engaged as valuations have fallen with public asset-light valuations down 13% on average and down ~15% for public asset-heavy comps."

150.    Following the November 1, 2018, conference call, trading commenced in XPO's stock and it fell 2.67% to $86.99 (as the S&P 500 rose 0.44% that day). XPO's stock continued to decline as December approached.

***Just as XPO Was "Very Close" to Closing a Deal that Would "Double" Its Size and Bury the Amazon Problem, Executives Let Slip Material Non-Public Information on December 11, 2018 that Triggered a Trading Halt on the NYSE And Forced XPO to Disclose Yet Another Amazon-Related "Miss"***

151.    By the second week of December 2018, XPO was purportedly close to fulfilling its merger rouse. Defendant Jacobs later told participants at an industry conference that the deal "would have effectively *doubled* XPO's $17 billion a year size '*in short order*,' before it shifted gears and launched a sizable stock repurchase plan to capitalize on the equity's low price levels." Defendant Jacobs told other reporters that XPO was "'very close to doing an acquisition'" before December 13, 2018. A transaction that "doubled" XPO's size would have given XPO the ability to largely bury the negative effects of Amazon's decision to leave XPO while providing Jacobs some basis to claim "doubled" growth as the 2019 calendar year unfolded.

152.    But XPO ultimately squandered its prospects to complete a merger. First, on December 11, 2018, defendant Jacobs, XPO's new CSO, and the Company's top information technology officer accidentally disclosed material non-public information during market hours to a select group of investors at a private lunch meeting on behalf of XPO.[14]

153.    Trading authorities quickly caught wind of XPO's leaked information. They halted trading of XPO stock on the NYSE when the market first opened on the following day, December 12, 2018, until XPO disclosed the leak to the rest of the market.

154.    XPO purported to comply with its disclosure obligations by filing the following message:

Regulation FD Disclosure

On December 11, 2018, XPO Logistics, Inc. (the "Company") met with a group of investors in the ordinary course of its investor relations activities.

---

[14]    *See* December 12, 2018, Deutsche Bank, "Takeaways from mgmt. meeting and 8-k disclosures."

At this meeting, the Company disclosed that it anticipates 12-15% year-over-year growth in adjusted EBITDA in 2019. Adjusted EBITDA is a non-GAAP measure.

In addition, at this meeting, the Company reaffirmed that it remains on track to generate approximately $625 million of free cash flow for 2018, and expects to generate approximately $650 million of free cash flow for 2019. Free cash flow is a non-GAAP measure.

On February 12, 2018, the Company disclosed in its annual report on Form 10-K for the year ended December 31, 2017 that, as of year- end, the Company had federal net operating losses for all U.S. operations of $188.1 million and federal tax credit carryforwards of $34.4 million. The Company expects to utilize substantially all of its federal net operating losses for the 2018 tax year.

155.    This new information triggered a two-day decline that wiped out 33% of the Company's market value, as its per share stock price fell from $66.69 at the close of trading on December 11, 2018 to $44.50 at the close of trading on December 13, 2018, on heavy trading volume.

156.    Several aspects of the December 12th surprise announcement were negative and contributed to the sharp decline. To start, the announcement revealed, in substance, that XPO was *not* going to make the $625 million in free cash flow guidance. In admitting that the Company needed to accelerate "substantially all" $188 million in tax benefits that were not even set to expire until 2024, XPO was, in essence showing that it could *not* generate $625 million in free cash flow in 2018 because, simply stated, it had not earned enough money from its "largest customer" to do so. XPO made this concession despite: (1) having just reaffirmed that number in the context of lowering earnings guidance (purportedly) on account of the House of Fraser issue; and (2) claiming in the same surprise announcement that it was "on track" to make that $625 million annual target by the end of the year.

54

157.     Some analysts noticed how the Company had originally included $110 million in tax payments the original budget it used to derive its $625 million free cash flow figure, but that XPO did not have enough cash to make any more tax payments than the $46 million it had paid through the third quarter of the year. Deutsche Bank analysts, for example, wrote on the day of the announcement that "[h]igher cash taxes appears to reflect a push out from '18 into '19 This 'benefit' appears to be making up for higher than expected working capital investment to facilitate strong growth, which translates to *no change in 2018 free cash flow expectations of $625M despite much lower cash taxes*." The "push out" of 2018 taxes into 2019 similarly affected XPO's 2019 free cash flow guidance.

158.     In sum, the Individual Defendants attempted to partially plug XPO's 2018 free cash flow gap with a clever tax move—pulling in $188 million in tax benefits and thus assuring tax liabilities into 2019—but the market saw through it.

159.     Not only did XPO lower, in substance, its guidance about the amount of free cash flow that it would generate in 2018, it simultaneously lowered its adjusted EBITDA guidance of the *entire* 2019 year. The lowering of 2019 adjusted EBIDTA guidance reflected XPO's inability to earn enough money in that period to meet its guidance and XPO's need to drag up to $188 million in tax benefits from 2019 and apply them all to 2018 to plug the earnings gap that Amazon created by leaving XPO over the course of 2018. The resulting lower free cash flow guidance for 2019 also surprised the market and significantly missed analysts' estimates. "The free cash flow guide for 2019 [of $650M] was disappointing relative to prior Wall Street estimates of $884MM," as Wells Fargo wrote on December 14, 2018. Those estimates, in turn, flowed from the Individual

Defendants' most recent (misleading) statements following the purported House of Fraser "miss" and related statements, which they made to the market on November 1, 2018.[15]

160.   The December 12, 2018, "trading halt" disclosures likewise partially corrected XPO's prior misleading statements masking the toll that Amazon's decision to start leaving XPO was actually having on the Company's operations and financial performance. For example, the disclosure revealed that XPO could not grow earnings at the "base-case" levels that defendant Jacobs had communicated to the market just six weeks prior to that date. That "base-case" assumed Amazon would keep growing the Company at levels that XPO had included in its "bottoms up" budgeting process at the beginning of the 2018. Amazon continued lowering the amount of business it gave to XPO throughout the year and XPO accidentally leaked new numbers—at least partially accounting for life without Amazon—at its lunch on December 11, 2018, as noted above.

161.   Thus, the *only* reason the market learned of the partially corrected numbers on December 12th is because someone told the trading authorities about it, prompting a halt on trading that forced XPO to disclose the new, materially lower EBITDA numbers to the market. These new numbers showed XPO could not make defendant Jacobs's "*base-case*" earnings growth of 15%-18%. The "base-case" would now be 12%-15%, which was a materially negative shift in the Company's growth rates. This development also contributed to XPO's stock price decline.

162.   As investors continued to digest XPO's free cash flow and earnings disclosures, on December 13, 2018, a short seller, Spruce Point Capital Management ("Spruce Point"), published a negative report on the Company, titled "Trucking Ridiculous; End of the Road." The report criticized XPO's management and the accuracy and clarity of XPO's disclosures to investors.

---

[15]   For example, Deutsche Bank modeled $800 million in free cash flow for 2019 following the XPO's most recent November 1, 2018 earnings call where the Company gave earnings guidance for 2019.

Analysts from Deutsche Bank published a report on December 13, 2018, criticizing one of the cash flow calculations that Spruce Point had made in its report and commented on XPO's falling stock price "in the context of the current tape *and lower guidance*." Deutsche Bank further wrote that its cash flow calculations should have given XPO credit for the proceeds that XPO earned from selling assets like trucks and other equipment for $69 million in 2016 and $79 million in 2017. Finally the Deutsche Bank analysts further concluded that the "*qualitative aspects of the report are not new*."

163.    As the lower earnings and free cash flow guidance continued to flow through the market, XPO's common stock continued its fall from $66.69 per share at the close of trading on December 11, 2018 to $44.50 on December 13, 2018—*a decline of 33%*.

164.    Incredibly, Defendants made *more* misleading statements in the context of responding to information in the Spruce Point report. The Individual Defendants called the report old news, in substance, and then told the market that "XPO's long-term financial outlook remains positive." This misleading statement appears in a December 14, 2018, *Comtex News Network* article that it published at 9:10 a.m. (EST). The article specified the timing of XPO's statement and quoted its substance as follows:

> *This morning the company responded*: "Today's report from a short selling firm is intentionally misleading, with significant inaccuracies, and fails to reflect that XPO has delivered strong performance for its long-term shareholders. The facts demonstrate that [Spruce Point's] *claims, most of which have been previously floated and refuted*, are largely baseless and an attempt to string together unrelated pieces of incorrect information to paint an inaccurate impression of the company. Of particular note, our accounting practices are based on Generally Accepted Accounting Principles and are audited annually and reviewed quarterly by our independent auditors. *XPO's long-term financial outlook remains positive*. We will communicate directly with our investors and customers regarding [Spruce Point's] report."

165.    This statement was materially false and/or misleading at the time, because the Individual Defendants already knew, or should have known, that Amazon was always going to

leave and had already started that process in the spring or summer of 2018. Even defendant Jacobs later claimed, in a February 15, 2019 earnings call, that it was very soon after December 11th or 12th of 2018 that Amazon kept lowering the amount of business it gave to XPO. "Within a few days," defendant Jacobs said, "our postal injection business was significantly impacted by this customer's actions," referring to Amazon. These facts add to the many others showing that Amazon continued to reduce the amount of business it gave to XPO throughout the course of 2018 in a manner that was neither abrupt nor quick, as defendant Jacobs would later misleadingly complain in an attempt to address investors' disbelief.

166.    Having so devalued XPO's stock price and the Company's reputation through the December 11 accidental leak and subsequent partially-corrective disclosure, the Individual Defendants could not move forward with the planned blockbuster merger. The failure to complete the merger ultimately meant that XPO could not hide the Amazon loss after 2018 closed.

***After Failing to Find a Merger Partner Who Would Cover Up the Loss of Amazon in 2018, the Individual Defendants are Forced to Admit that XPO Lost Its "Largest Customer" (Amazon) and Always Knew that Amazon Was Going to Leave***

167.    Given the failed merger attempt, on February 14, 2019, XPO had to file its *own* standalone financial statements for the quarter and year ending 2018, without the benefit of mixing XPO's financial statements with those of a company equal in size on a "consolidated" basis.

168.    After the market closed on February 14, 2019, XPO filed several reports with the SEC, further revealing the effects that the Amazon departure had on XPO's business. Defendant Jacobs led a conference call the next day, February 15, 2019, by stating:

> Well, look, there's no other way to say it, *we missed the quarter*. We miscalculated the weakness in France and the U.K. *And in December, our largest customer pulled back* their postal injection business, which is part of last mile. *That affected our EBITDA in December. This had a significant impact in December and in the quarter.*

169.    Defendant Jacobs admitted, in response to an analyst's question, that Amazon's business contributed materially to XPO's growth over the preceding few years and that he knew the growth would come to end given Amazon's stated business plans:

> [Seaport Global Securities analyst:] [M]y question is, had they always—had this large customer always been a customer of 3PD [an XPO-acquired company] or just recently have you—had you grown with them?

> [Jacobs:] I'm not 100% certain of that, but I think that they were not a customer of 3PD. Or if they were, they were a small one. So the more important part of your question is, have we grown with them? *Yes, we grew a lot up with them over the last few years.* And *we knew* that, *that business wasn't going to stay forever* and forever and ever and ever *because of that particular customer's stated business plans* and because that customer is transactional in some respect in terms of the nature that they have with their vendors. And that's fair. Customers can have any kind of approach they want with their vendors. We didn't think it was going to come to end so quickly. We didn't think it was going to come to an end so abruptly. And it really hasn't come to an end. It's been downsized. We still have a chance to prove to them that maybe we should get a second chance and come back and do something that can help them. And I don't rule out that we could possibly get some business back, but we're not counting on it. We're counting on that they're going in a different direction for the most of their business. And that we should be redeploying those resources for new customers.

170.    Analysts asked questions about this admission, demonstrating that reasonable investors (including analysts who covered XPO) read the Company's disclosures—and assurances about House of Fraser being a "one off" occurrence—to mean that XPO did not expose shareholders to the kind of extreme customer and market concentration that Amazon represented:

> [BofA Merrill Lynch analyst:] So I wanted to start talking about customer concentration. One of the things that I think *XPO has touted as one of its strengths is that it's not overly focused on any particular customer.* But here, we've seen kind of 2 quarters in a row where some disappointing news from a particular customer has really put a real dent in results. And I want to talk about—I kind of want to get your thoughts on the extent to which maybe that perception is changing or how you manage your customer base maybe has shifted? . . .

> [Jacobs:] Well, in 2018, our top 5 customers represented about 11% of revenue, and you saw that in the K. The largest customer, however, represented roughly about 4%, 5% of that. 2/3 of that business has gone away, *so that's a body blow*, no question about it. Going forward, with that customer having downsized, we

anticipate that our top 5 customers in 2019 will represent about 8% of revenue. So customer concentration will be less. But when you lose your—when you lose the majority of your top customer's business, that hurts. Nothing you can do—there's nothing positive. It's only negative.

171.    On this same subject defendant Jacobs later admitted:

I'd also talk to you about our customer concentration. *Our customer concentration, it was too much.* We made a mistake letting one customer get $900 million of business with us. [It was] *just too much.* [It was] *too much concentration.* Previously, if you looked at our top 5 customers, it was about 11% of revenue and the biggest one was a little more than 1/2 of that, so *it was just too much concentration.* Going forward, we're going to be much more diversified. Our top 5 customers this year should be something around 7% of revenue and no customer will be more than 2% of revenue.

172.    Following the February 15, 2019, conference call that further revealed Amazon's

strategic and financial importance to XPO, the Company's stock price fell from a close of $59.55

the day before to $51.97 at the close of trading, for a loss of 12.73%.

173.    Analysts reacted negatively. For example, Barclays wrote in a report on the same

day that it was "materially lowering our price target on XPO shares given a significant strategic

shift and continuing earning headwinds," while noting the loss of "a large shipper (likely

Amazon)."

174.    Barclays appeared to suspect that Jacobs still was not giving them the full story:

"We believe the company was aware of the potential for losing a large piece of business late in

2018, right around the same time a now debunked but then impactful short seller report surfaced"

on December 13, 2018.

175.    Those analysts' suspicions were correct in part—the Individual Defendants truly

were aware of its potential of losing Amazon, but they arrived at that awareness well before the

middle of December 2018.

### THE INDIVIDUAL DEFENDANTS' MATERIALLY
### FALSE AND/OR MISLEADING STATEMENTS

176.     A money-losing enterprise for years, XPO began growing profits and revenue in 2016 at rates that exceeded its industry peers and made it the darling of Wall Street in its industry.

***August 2016 Statements***

177.     On August 3, 3016, XPO publicly reported its financial results for 2Q16. This was the first time that XPO reported a profit.

178.     In connection with the press release announcing its 2Q16 financial results, the Individual Defendants also put out a slide presentation and script (the "2Q16 Presentation"). The Individual Defendants also stated that the slide presentation should be read together with XPO's SEC filings, including its 2Q16 10-Q. As part of its 2Q16 Presentation, the Individual Defendants publicly claimed that XPO was a "well diversified company" with a "highly diversified" customer base.

179.     The next day on August 4, 2016, XPO held a conference call to discuss its quarterly results and answer questions posed by analysts and investors. During the call, defendant Jacobs spoke about how XPO reported "second-quarter results that confirmed that [the Company was] at a positive inflection point in the evolution of [its] business." He touted how XPO was a "very well diversified, well-functioning global business that provides significant value to [its] customers." The XPO CEO also asserted that the Company had a "clearly defined action plan" to grow earnings nearly 35% over the 2016 through 2018 period.

180.     Defendant Jacobs assured investors that the Company was generating record financial growth from a well-diversified base of business, concluding the call as follows:

> We started the call with saying that we're at a positive inflection point in the evolution of our Company. And that we are reaping the rewards of the last five years. We have built *a very well diversified*, well functioning global business that provides significant value to our customers.

> The proof is in the pudding. Look at the numbers this quarter. We had record EBITDA, way above expectations. We had record cash flow from ops, way above expectations. Record free cash flow. We have a clearly defined action plan to go from $1.265 billion of EBITDA this year to our $1.7 billion target in 2018.

181.     The Individual Defendants' statements on August 3 and 4, 2016, about XPO being "very well diversified" with a "highly diversified" customer base were misleading at the time they were made because the Individual Defendants had knowingly, or at the very least recklessly, masked the effects that its largest customer, *i.e.*, Amazon, had on XPO's growth and its customer concentration risk.

182.     On August 8, 2016, XPO publicly filed its 10-Q for 2Q16 with the SEC. This 10-Q incorporated risk factors previously laid out in XPO's SEC Form 10-K for fiscal 2015 ("2015 10-K"). One of those risk factors in XPO's 2015 10-K that remained unchanged in its 2Q16 10-Q, according to the Company, was that:

> No single customer accounted for more than 2% of our consolidated pro forma revenue for 2015. *We do not believe the loss of any single customer would materially impair our overall financial condition or results of operations*; however, collectively, some of our large customers might account for a relatively significant portion of the growth in revenue and margins in a particular quarter or year. Our contractual relationships with customers generally are terminable at will by the customers on short notice and do not require the customer to provide any minimum commitment. Our customers could choose to divert all or a portion of their business with us to one of our competitors, demand rate reductions for our services, require us to assume greater liability that increases our costs, or develop their own logistics capabilities. Failure to retain our existing customers or enter into relationships with new customers could materially impact the growth in our business and the ability to meet our current and long- term financial forecasts.

183.     This statement, incorporated into XPO's 2Q16 10-Q, that the Individual Defendants did not supposedly "believe the loss of any single customer would materially impair our overall financial condition or results of operations" was misleading because by August 2016, the Individual Defendants knew, or were reckless in not knowing, that if and when Amazon ceased

being an XPO customer, its departure would have significantly negative ramifications for XPO financially.

184.    Both defendants Jacobs and Hardig signed XPO's false and/or misleading 2Q16 10-Q.

185.    XPO's 2Q16 10-Q also contained the following false and/or misleading SOX certifications, signed by defendants Jacobs and Hardig:

1.  I have reviewed this quarterly report on Form 10-Q of XPO Logistics, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the

effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

    5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions);

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

***November 2016 Statements***

186.    On November 2, 2016, XPO issued a press release announcing its third quarter of 2016 ("3Q16") financial results. Just as they did for the previous quarter, the Individual Defendants released a slide presentation and script that repeated their previous proclamation that the Company was "well diversified" with a "highly diversified" customer base.

187.    The following day, November 3, 2016, the Company hosted a conference call with financial analysts and investors to discuss XPO's 3Q16 financial results. Similar to what he told analysts and investors in August 2016, Jacobs told them how the Company's 3Q16 results confirm that XPO has "reached a positive inflection point in the evolution of [its] business."

188.    Later during the November 3 call, a Barclays analyst asked about what macro risks (if any) XPO saw with respect to revenue growth. As part of his response, XPO's CEO Jacobs

stated that while there was some risk, he emphasized that the Company's "strategy has been to be very well diversified, well diversified by geography, *well diversified by type of customer*, well diversified by service offering."

189.    The Individual Defendants' November 2 and 3, 2016 statements about XPO's well diversified business and customer base were misleading at the time they were made because the Individual Defendants had knowingly, or at the very least recklessly, masked the effects that its largest customer, *i.e.*, Amazon, had on XPO's growth and the customer concertation risk presented by Amazon.

190.    On November 8, 2016, XPO publicly filed its 10-Q for 3Q16 with the SEC. This 10-Q incorporated risk factors previously laid out in XPO's 2015 10-K, including the representation that "[w]e do not believe the loss of any single customer would materially impair our overall financial condition or results of operations." As detailed previously, this statement was misleading because by November 2016, the Individual Defendants knew, or were reckless in not knowing, that once Amazon ceased being an XPO customer, its departure would have a significantly negative impact on XPO's financial condition and/or results of operations.

191.    Both defendants Jacobs and Hardig signed XPO's false and/or misleading 3Q16 10-Q.

192.    XPO's 3Q16 10-Q also contained false and/or misleading SOX certifications signed by defendants Jacobs and Hardig that are nearly identical to the ones in the Company's 2Q16 10-Q.

***February 2017 Statements***

193.    On February 21, 2017, XPO issued a press release announcing its financial results for its fiscal year 2016. Just as it did for 2Q16 and 3Q16, the Individual Defendants released a

slide presentation and script reiterating that the Company was "well diversified" and has a "highly diversified" customer base.

194.    On February 28, 2017, XPO publicly filed its 10-K for fiscal 2016 ("2016 10-K") with the SEC. In this 2016 10-K, the Individual Defendants touted that XPO had a "*diversified customer base that minimizes our concentration risk*: in 2016, approximately 8% of our revenue was attributable to our top five clients, with our largest customer accounting for approximately 3% of revenue."

195.    Like those Relevant Period public statements made by the Individual Defendants in previous quarters, the Individual Defendants' statements on February 21 and 28, 2017 were misleading at the time they were made because the Individual Defendants had knowingly, or at the very least recklessly, masked the effects that Amazon, XPO's largest customer, had on the Company's growth and the customer concertation; especially in light of the fact that Amazon had already informed the Individual Defendants that it was going to leave.

196.    Defendants Jacobs, Hardig, Ashe, DeJoy, Jesselson, Kingshott, Papastavrou and Shaffer all signed XPO's false and/or misleading 2016 10-K.

197.    XPO's 2016 10-K also contained false and/or misleading SOX certifications signed by defendants Jacobs and Hardig that are nearly identical to the ones in the Company's 2Q16 and 3Q16 10-Qs.

*May 2017 Statements*

198.    On May 3, 2017, XPO issued a press release announcing its financial results for the first quarter of 2017 ("1Q17"). Just as they did in previous quarters, the Individual Defendants released a slide presentation and script reiterating that the Company was "well diversified" has a "highly diversified" customer base.

199.     The following day on May 4, 2017, the Company hosted a conference call with financial analysts and investors to discuss XPO's 1Q17 financial results. One important topic that came up during the call was the long-term sustainability of XPO's growth: one analyst asked whether XPO's growth was sustainable over the long term. Defendant Jacobs responded to one such question during an XPO quarterly earnings call:

> [KeyBanc analyst:] Let me ask it this way, is there *anything in the first quarter that you view as being unsustainable* or anything that kind of helped you if it was fuel trends in the LTL business *or something that you're watching that, that may not repeat* in the first quarter as you think about the progression through the year?

> [Jacobs:] *I don't*, Todd. I think the first quarter was a quarter where we had to work hard. And we had some headwinds, we had some tailwinds. But internally, as an organization, it's really jelling. And people are very focused on the right levers in order to improve both the profitability of the company and customer service at the same time. *And it's broad-based by our different business lines and by our geography*. So I am optimistic about the year, starting off on a very good foot.

200.     Defendant Jacobs's public assurances, that XPO gave investors exposure to a company that enjoyed broad-based growth, are consistent with his and the Individual Defendants' other public statements assuring investors throughout the Relevant Period that XPO's customer makeup did not expose them to too much customer "concentration risk."

201.     On May 9, 2017, XPO publicly filed its 1Q17 10-Q with the SEC. In this 10-Q, the Individual Defendants touted that XPO's "customers are also highly diversified across every major industry, with retail and e-commerce historically accounting for approximately a quarter of our revenue."

202.     These statements made by the Individual Defendants in May 2017 were misleading at the time they were made because the Individual Defendants knowingly (or at the very least recklessly) masked the effects that Amazon, its largest customer, had on XPO's growth and the customer concertation risk; especially in light of the fact that Amazon had already informed the

Individual Defendants that it was going to leave. Moreover, defendant Jacobs's assurances during the May 4, 2017 call response about how he did not see anything in 1Q17 as being "unsustainable," was misleading. The reason: defendant Jacobs knew (or was reckless in not knowing) that in fact, XPO's growth rate was unsustainable because Amazon was driving growth and the Individual Defendants knew or recklessly disregarded that Amazon was going to leave as a customer because that was its "stated business plan[]" from the beginning.

203.    XPO's 1Q17 10-Q also contained false and/or misleading SOX certifications signed by defendants Jacobs and Hardig that are nearly identical to the ones in the Company's previous quarterly and annual filings made with the SEC during the Relevant Period.

### July 2017 Statements

204.    On July 17, 2017, XPO announced that it planned to make an offering of 11,000,000 shares of its common stock in a registered underwritten offering.

205.    On or about July 20, 2017, XPO priced the 11,000,000 shares at $60.50.

206.    In connection with XPO's announcement of the Secondary Offering, the Company filed a Registration Statement on SEC Form S-3 (the "Registration Statement") and a Rule 424(b) Prospectus with the SEC.

207.    These filings were signed by defendants Jacobs and Hardig and incorporated by reference, XPO's materially misleading: (1) 2016 10-K and 1Q17 10-Q.

208.    The Registration Statement, including the Prospectus, was negligently prepared and, as a result, contained untrue statements of material fact and omitted material information that was required to be disclosed pursuant to the regulations governing its preparation.

209.    As detailed above, each of the statements incorporated by reference into in the Registration Statement filed with the SEC was materially false and misleading for failure to

disclose that XPO's growth was heavily dependent on Amazon's business that was unsustainable because Amazon did not intend to be a long-term customer of XPO.

*August 2017 Statements*

210.    On August 2, 2017, XPO issued a press release announcing its financial results for the second quarter of 2017 ("2Q17"). Just as they did in previous quarters, the Individual Defendants released a slide presentation and script reiterating that the Company has a "highly diversified" customer base.

211.    On August 4, 2017, XPO publicly filed its 2Q17 10-Q with the SEC. In this 10-Q, the Individual Defendants touted that XPO's "customers are also highly diversified across every major industry, with retail and e-commerce historically accounting for approximately a quarter of our revenue."

212.    The Individual Defendants' statements on August 2, 2017 and August 4, 2017 were false and/or misleading at the time they were made because the Individual Defendants had knowingly, or at the very least recklessly, masked the effects that Amazon, XPO's largest customer, had on XPO's growth and customer concertation risk; especially in light of the fact that Amazon had informed the Individual Defendants that it was going to cease doing business with XPO.

213.    XPO's 2Q17 10-Q also contained false and/or misleading SOX certifications signed by defendants Jacobs and Hardig that are nearly identical to the ones in the Company's previous quarterly and annual filings made with the SEC during the Relevant Period.

*November 2017 Statements*

214.    On November 2, 2017, XPO issued a press release announcing its financial results for the third quarter of 2017 ("3Q17"). Just as they did in previous quarters, the Individual

Defendants released a slide presentation and script reiterating that the Company has a "highly diversified" customer base.

215.   On November 6, 2017, XPO publicly filed its 3Q17 10-Q with the SEC. In this 10-Q, the Individual Defendants touted that XPO's "customers are also highly diversified across every major industry, with retail and e-commerce historically accounting for approximately a quarter of our revenue."

216.   The Individual Defendants' statements on November 2, 2017 and November 6, 2017 were false and/or misleading at the time they were made because the Individual Defendants had knowingly, or at the very least recklessly, masked the effects that Amazon, XPO's largest customer, had on XPO's growth and customer concertation risk; especially in light of the fact that Amazon had informed the Individual Defendants that it was going to cease doing business with XPO.

217.   XPO's 3Q17 10-Q also contained false and/or misleading SOX certifications signed by defendants Jacobs and Hardig that are nearly identical to the ones in the Company's previous quarterly and annual filings made with the SEC during the Relevant Period.

*February 2018 Statements*

218.   On February 7, 2018, XPO issued a press release announcing its financial results for its fiscal year 2017. Just as they did in previous quarters, the Individual Defendants released a slide presentation and script touting the Company's "highly diversified" customer base.

219.   On February 12, 2018, XPO publicly filed its 10-K for fiscal 2017 ("2017 10-K") with the SEC. In this 10-K, the Individual Defendants touted that they have a "*diversified customer base that minimizes our concentration risk*: in 2017, approximately 10% of our revenue was attributable to our top five customers."

220.    The Individual Defendants' statements on February 7, 2018 and February 12, 2018 were false and/or misleading at the time they were made because the Individual Defendants had knowingly, or at the very least recklessly, masked the effects that Amazon, its largest customer, had on XPO's growth and the customer concentration risk; especially in light of the fact that Amazon had informed the Individual Defendants that it was going to cease doing business with XPO.

221.    Specifically, as to the Individual Defendants' statement in XPO's 2017 10-K regarding the Company's customer diversification, this nearly identical statement to the one made in the 2016 10-K misleadingly omitted the disclosure of the size of XPO's largest customer (which was 3% of revenue in 2016). The Individual Defendants' decision to knowingly, or at the very least recklessly, alter this disclosure in XPO's 2017 10-K was misleading because, as the Individual Defendants later admitted, Amazon boosted XPO's growth materially during 2016 and constituted more than 3% of the Company's revenue at the time.

222.    Defendants Jacobs, Hardig, Ashe, DeSalva, Jesselson, Kingshott, Papastavrou and Shaffer all signed XPO's false and/or misleading 2017 10-K.

223.    XPO's 2017 10-K also contained false and/or misleading SOX certifications signed by defendants Jacobs and Hardig that are nearly identical to the ones in the Company's previous quarterly and annual filings made with the SEC during the Class Period.

***May 2018 Statements***

224.    On May 2, 2018, less than ten days after announcing the hiring of their new COO, Wagers, who, prior to that date was the former head of Amazon's finance of its worldwide transportation and logistics operation, XPO issued a press release announcing its financial results for 1Q18.

225.    Just as they did in previous quarters, the Individual Defendants released a slide presentation and script. However, unlike in prior reporting periods, the Individual Defendants instead stated that XPO's "markets" as opposed to "customers" were "highly diversified"; a phrase it repeated in its 1Q18 10-Q it filed with the SEC five days later on May 7, 2018.

226.    But there was a reason the Individual Defendants stopped publicly telling investors that the Company's customer base was "highly diversified" as by this time in May 2018: the Individual Defendants were well aware, or at least they should have been, that Amazon, XPO's largest customer and the one responsible for the material growth projections made by the Individual Defendants in prior quarters, had already put in motion its plans to end its business relationship with XPO in the coming months. Obviously, the Individual Defendants hoped investors would not pick up on the new phraseology, and luckily for XPO, they did not.

227.    This was at least partially due to the fact that in XPO's press release announcing the Company's 1Q18 financial results, the Individual Defendants re-affirmed the exact same 2018 financial guidance that they had given on February 7, 2018—*i.e.,* before Amazon began acting on its plans to leave XPO.

228.    Specifically, the 1Q18 Company press release stated that the Individual Defendants "reaffirmed both targets in [its] outlook: adjusted EBITDA of *at least $1.6 billion* for full year 2018, and 2017–2018 cumulative free cash flow of *approximately $1 billion*."

229.    This guidance was materially false and/or misleading because it included Amazon projections that the Individual Defendants knew, or at the very least should have known, would not come to fruition because Amazon had already started to reduce its business with XPO.

230.    During a call with analysts and investors hosted by XPO on May 3, 2018, defendant Jacobs reaffirmed that the Company remains "on track to deliver on [its] targets of at least $1.6

billion of adjusted EBITDA this year and approximately $1 billion of cumulative free cash flow for 2017 and 2018."

231.   Not only did defendant Jacobs reaffirm the Company's materially misleading guidance, but he told analysts and investors on the May 3 call there was *no reason* to think the business would slow relative to what XPO management had planned in February 2018, implicitly representing that Amazon would not start pulling business from XPO at any point in 2018:

> [Deutsche Bank analyst:] *[I]s there any kind of reason to think the revenue and EBITDA growth* of the business is actually very strong, not even just the 11% or the 10.4% you did last quarter, but really kind of even within that high single-digit framework that you provided. *Is there any reason to think kind of that type of revenue growth and EBITDA growth that you're achieving even this year slows?* If you can just help us think about that as you look at the pipeline of new business, because that is kind of top of mind right now, especially in the transportation segment?

> [Jacobs:] *Sure. There is no reason to think it's going to slow,* and I don't know that we're in any better position than everyone else to predict what the economy is going to do over the next few years So for the time being and for the foreseeable future, absent some geopolitical events, *life looks good, at least from our point of view just looking at our customers and seeing what our customers are doing and saying*.

232.   This statement by defendant Jacobs was materially misleading at the time because Amazon's actions showed that it had started to act on its previously-stated intention to stop doing business with XPO. Amazon was XPO's largest customer, but, as the entire world knew at the time (including defendant Jacobs), Amazon also represented one of the most important players in the e-commerce market as a whole.

233.   No reasonable executive in defendant Jacob's shoes could have thought there was "*no reason*" to think the Company would not meet the revenue and earnings growth that XPO had planned at the beginning of the year, knowing what Jacobs actually knew about Amazon at the time, including that: (1) in February 2018 XPO internally *projected* Amazon would generate over $950 million for 2018; (2) Amazon's stated business plans were to leave XPO over the long term;

and (3) Amazon actually beginning to reduce its use of XPO in the March/April 2018 time frame, as reflected in XPO's lower tonnage and Edgerton warehouse activities, which continued to worsen.

234.    As defendant Jacobs understood, these conditions meant that XPO was its most important customer and business partner who gave XPO access to the e-commerce market.

235.    On or around May 9, 2018, defendant Jacobs went on the *CNBC* television show "Mad Money," hosted by Cramer, who told viewers: "To the extent that any investors had any concerns about XPO's relationship with Amazon, Jacobs reassured them that they had nothing to worry about."

236.    During the segment with the Company's CEO, Cramer noted how XPO and Amazon had recently "blown away the numbers" and that XPO and Amazon were "synergistic" in some ways. Jacobs responded:

> [Jacobs:] Amazon's growing so much faster than we are. We're proud that we grew 11% (organically) in the first quarter, so compared to other transportation companies, we're at the top. Amazon grew 45%.
>
> [Cramer:] That's true.
>
> [Jacobs:] They are twice the size of themselves every two years. [Cramer:] But you play a big role in trying to get bigger . . .
> packages to people[] everywhere.
>
> [Jacobs:] Absolutely. *And we have Amazon as a customer* and we have *many other ecommerce players* as a customer. *We're facilitating their growth*.

237.    Defendant Jacobs's publicly aired statements on "Mad Money" were materially misleading because, although he told viewers that XPO was "facilitating [Amazon's] growth," he failed to mention was that Amazon was simultaneously starting to unwind its business with the Company—exactly as Amazon told the Individual Defendants it would do.

***August 2018 Statements***

238.     On August 1, 2018, XPO issued a press release announcing its financial results for

2Q18. Like they did in the previous quarter, the Individual Defendants reaffirmed its guidance that

XPO was "on track to deliver on [its] target of at least $1.6 billion of adjusted EBITDA this year,

which reflects a 17% increase over 2017."

239.     This guidance was materially false and/or misleading because it included Amazon

projections that the Individual Defendants knew, or at the very least should have known, would

not come to fruition because Amazon had already started to withdraw its business from XPO.

240.     During a call with analysts and investors hosted by XPO on August 2, 2018,

defendant Jacobs reaffirmed this materially misleading earnings and cash flow guidance.

241.     At the time, XPO's cash flow outlook for 2017-2018 was that it would generate

"approximately $1 billion," which meant the Company would generate approximately $625

million in free cash flow for 2018 because it had generated $375 million in free cash flow the prior

year. XPO's EBITDA outlook was "at least $1.6 billion" for 2018. Jacobs had previously told the

market that these figures were the same as the Company's internal numbers and that he would let

the market know if anything changed. This was a lie because things had changed. Rather than

admitting the Company's problems with Amazon, he pretended they did not exist and reaffirmed

the Company's full-year guidance:

> [Deutsche Bank analyst:] Just want to understand is kind of the 17% or mid-teens
> type *EBITDA growth* that *you're posting this year sustainable in your view*, as you
> look *through '19 and '20, given the book of business* and then, does the CapEx
> intensity change at all. I think you're running about 2.8% of sales this year. Does
> that actually go down as the sales growth, or should we expect that to kind of move
> up, given some of the initiatives that you're accelerating?
>
> [Jacobs:] Sure. So let's do all 3 lines. Let's do organic *revenue growth, let's do*
> *EBITDA growth, let's go free cash flow/CapEx* since they're related to each other.
> On the sales side, on the *revenue growth side*, very buoyant, that's partly because
> it's a good economy, it's a good market. It's partly because we're doing a lot of

company-specific things in terms of operational excellence, in terms of hitting on all 8 cylinders that customers are rewarding us with our greater-than-fair share of their wallet. So I expect that organic revenue growth is going to stay in this high level, high single digits, low-double digits for the foreseeable future. *I don't see any slowing down on that*. EBITDA, we haven't done a bottoms-up budget yet at all, that process is just starting. On a preliminary basis, yes, I think something in the *15% to 18% range is very reasonable* to assume for continued *EBITDA growth* for the foreseeable future.

In terms of free cash flow, we will generate more free cash flow next year than we did this year, even though we've generated very substantial amount of free cash flow this year. And this year we'll have about 70-something percent more free cash flow than last year. I don't think it's going to be 70% more, because I think there's going to be more opportunities for deploying CapEx, but it's way too early in this year to be giving specific guidance for CapEx for next year. But I can tell you this: last week, we had about 45 of our top executives in for 3 days for quarterly operating review. People are confident in their business. Peoples' customers are confident in their business.

242.    Here, as before, defendant Jacobs reassured the market "I don't see any slowing down" on the Company's revenue growth, and similarly told the market that that 15%-18% EBITDA was reasonable, which was significant at the time because XPO had reported 18% growth in the first quarter of the year, but lower growth of 16% in the second quarter of the year as Amazon continued to act on its "stated business plans" and, as Jacobs knew, the Amazon business "was going to come to an end."

243.    Defendant Jacobs's EBITDA statement—that it was "*very reasonable* to assume" 16%-18% earnings growth for the foreseeable future—was materially misleading at the time for these and other reasons underlying Amazon's declining business with XPO.

244.    Defendant Jacobs's assertion that XPO would generate even "more free cash flow" in 2019 as compared to 2018 and his statement that "we'll have about 70- something percent more free cash flow [this year, 2018] than last year" was materially misleading for similar reasons.

245.    Defendant Jacobs knew, or recklessly disregarded, that his guidance was misleading because it assumed that Amazon's business would continue growing XPO as it had

over the past few years even though he knew that Amazon's business with XPO was "going to come to an end" and that Amazon's wind down process had already begun.

***October & November 2018 Statements***

246.     On October 31, 2018, XPO issued a press release announcing its financial results for 3Q18. In the press release, the Individual Defendants reported that XPO had missed earnings and revenue expectations due to a "customer bankruptcy."

247.     On November 1, 2018, XPO held a conference call with analysts and investors to discuss the Company's 3Q18 financial results. During the call, defendant Jacobs chalked up the miss to a "rounding error" of a customer that made XPO "miss the quarter."

248.     These statements by the Individual Defendants were materially misleading because the "miss" XPO suffered in 3Q18, was not solely due to some "rounding error" and/or "customer bankruptcy," but was instead at least partially due to the significant slow-down in business from XPO's largest customer, Amazon.

249.     During the November 1 call, the Individual Defendants also misrepresented that XPO had made the decision—"our decision" or "our strategy," to decrease its shipment tonnage, when, in fact, Amazon's reduction of its use of XPO was the real reason the Company was suffering decreased tonnage.

250.     The same applies to the Individual Defendants' statement that logistics operating income had fallen from $67 million to $60 million, purportedly as a result of the House of Fraser customer "rounding error." As the material wind down in XPO's Amazon fulfillment centers shows, a material portion of that $7 million drop came from Amazon, as further evidenced by XPO's admissions that Amazon's business represented a higher earnings "margin" than the rest of its customers on average.

251. Finally, at the same time, the Individual Defendants misleadingly "reaffirmed" 2018 free cash flow guidance and revised guidance of $1.585 billion in earnings for XPO's "full year 2018" targets, despite the fact that they knew, or at the very least should have known, by that point in time that the revised guidance did not merely "reflect[] the impact of the [House of Fraser] customer," but that the quarter's performance was more accurately affected by Amazon's reduction in business. The statement also failed to reflect Amazon's known decision to stop using XPO.

## THE INDIVIDUAL DEFENDANTS FAILED TO DISCLOSE INFORMATION REQUIRED UNDER ITEM 303 OF SEC REGULATION S-K

252. The Individual Defendants violated their duty under Item 303 of Regulation S-K, 17 CFR §229.30, to disclose XPO's unsustainable reliance on Amazon business in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") sections of the following Form 10-K and 10-Q reports that it filed with the SEC during the Class Period: 2Q16 10-Q, 3Q16 10-Q, 2016 10-K, 1Q17 10-Q, 2Q17 10-Q, 3Q17 10-Q, 2017 10-K, 1Q18 10-Q, 2Q18 10-Q, and 3Q18 10-Q ("Relevant Period Form 10-Ks and 10-Qs").

253. Among other things, Item 303 required XPO to disclose in the MD&A sections of its 10-K and 10-Q SEC filings "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

254. There is no question that the Individual Defendants violated Item 303 in failing to disclose known trends and uncertainties relating to Amazon. As the Individual Defendants knew or, or should have known: (1) Amazon generated material and unsustainable growth for XPO during the 2016-2018 timeframe because—as Amazon told XPO—Amazon was going to stop

doing business with XPO over the long term; and (2) Amazon acted on its stated business plans and started reducing its business with XPO around April 2018.

255.    And the Individual Defendants knowingly, or at least recklessly, failed to disclose: (1) Amazon's effect on XPO's operating metrics (*e.g.*, "tonnage" volumes); (2) Amazon's effect on XPO's reported results (*e.g.*, free cash flow, earnings and revenue); and (3) Amazon's effect on XPO's financial prospects (*e.g.*, its earnings and free cash flow guidance).

256.    The Individual Defendants' Item 303 omissions were material. They were quantitatively material because Amazon was XPO's largest customer and had a quantitatively material effect on its reported operating and financial metrics and prospects. Individually, and in the aggregate, the Individual Defendants' Item 303 omissions were material qualitatively because Amazon is one of the largest purchasers of transportation and logistics services in the world, has grown at rates over 45% during 2016-2018 alone, and represents one of the most promising transportation and logistics business opportunities in the market. In short, Amazon represented a major force in XPO's growth, future prospects and waning fortunes as it began leaving XPO.

257.    The SEC's Division of Corporate Finance Financial Reporting Manual ("SEC Manual") provides additional context to XPO's Item 303 obligations, further revealing the Individual Defendants' disclosure violations. The SEC Manual states that the purpose of the MD&A section "is [to provide] a narrative explanation of the financial statements and other statistical data that the registrant believes will enhance a readers' understanding of its financial condition, changes in financial condition and results of operation." SEC Manual §9110.1. The MD&A sections should strive:

     a.   To provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;

     b.   To enhance the overall financial disclosure *and provide the context* within

which financial information should be analyzed; and

c.  To provide information about the quality of, and *potential variability of, a company's earnings and cash flow so that investors can ascertain the likelihood that past performance is indicative of future performance*.

SEC Manual §9110.2.

258.   The Individual Defendants did not, however, reveal that much of XPO's growth came from a single, unsustainable customer, even though the Individual Defendants were aware or were reckless in disregarding that XPO's heavy reliance on Amazon and Amazon's plan to stop doing business with XPO would have a material unfavorable financial impact on XPO's future growth. The Individual Defendants omitted this information from the 10-Ks and 10-Qs issued during the Relevant Period.

259.   The Individual Defendants therefore failed to provide the context within which XPO's financial information should be analyzed. The Individual Defendants also failed to provide information sufficient to allow investors to "ascertain the likelihood that past performance is indicative of future performance." As a result, the Individual Defendants violated their duty under Item 303 to disclose a known trend or uncertainty likely to have a "material . . . unfavorable impact on net sales or revenues or income."

## MATERIALLY FALSE AND MISLEADING PROXY STATEMENTS

260.   In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, defendants Jacobs, Ashe, Dejoy, Desalva, Jesselson, Kingshott, Papastavrou and Shaffer likewise caused the Company to issue false and misleading proxy statements.

261.   On April 17, 2017, defendants Jacobs, Ashe, Dejoy, Jesselson, Kingshott, Papastavrou and Shaffer caused the Company to file with the SEC on Form DEF 14A and

disseminated to shareholders a Proxy Statement (the "2017 Proxy") in connection with the Company's annual shareholder meeting to be held on May 10, 2017. Defendants Jacobs, Ashe, Dejoy, Jesselson, Kingshott, Papastavrou and Shaffer drafted, approved, reviewed, and/or signed the 2017 Proxy before it was filed with the SEC and disseminated to XPO's shareholders. Defendants Jacobs, Ashe, Dejoy, Jesselson, Kingshott, Papastavrou and Shaffer knew or were deliberately conscious in not knowing, that the 2017 Proxy was likewise materially false and misleading.

262.    Among other things, the 2017 Proxy sought shareholder approval for (i) the election of defendants Jacobs, Ashe, Dejoy, Jesselson, Kingshott, Papastavrou, and Shaffer, and the approval, on a non-binding, advisory basis, of the compensation of certain executive officers (including defendants Jacobs, Hardig, and Malat). In addition, the 2017 Proxy described director responsibilities, the duties of each committee, Board risk assessment and management, and explicitly referenced the Code, which includes special ethical obligations regarding financial reporting such that all SEC filings are to be accurate.

263.    The Board sought a "for" vote in connection with the director elections and executive compensation.

264.    The 2017 Proxy was false and misleading because it solicited XPO shareholder votes for director elections and an advisory vote on executive compensation even though defendants Jacobs, Ashe, Dejoy, Jesselson, Kingshott, Papastavrou, and Shaffer were aware, but had failed to disclose: (1) Amazon generated material and unsustainable growth for XPO during the 2016-2018 timeframe because—as Amazon told XPO—Amazon was going to stop doing business with XPO over the long term; and (2) Amazon acted on its stated business plans and started reducing its business with XPO around April 2018.

265.    Without this information, defendants Jacobs, Ashe, Dejoy, Jesselson, Kingshott, Papastavrou, and Shaffer were all elected to serve as XPO directors and the advisory vote on executive compensation was approved.

266.    On April 18, 2018, defendants Jacobs, Ashe, DeSalva, Jesselson, Kingshott, Papastavrou, and Shaffer caused the Company to file with the SEC on Form DEF 14A and disseminated to shareholders a Proxy Statement (the "2018 Proxy") in connection with the Company's annual shareholder meeting to be held on May 17, 2018. Defendants Jacobs, Ashe, DeSalva, Jesselson, Kingshott, Papastavrou, and Shaffer drafted, approved, reviewed, and/or signed the 2018 Proxy before it was filed with the SEC and disseminated to XPO's shareholders. Defendants Jacobs, Ashe, DeSalva, Jesselson, Kingshott, Papastavrou, and Shaffer knew or were deliberately conscious in not knowing, that the 2018 Proxy was likewise materially false and misleading.

267.    Among other things, the 2018 Proxy sought shareholder approval for (i) the election of defendants Jacobs, Ashe, DeSalva, Jesselson, Kingshott, Papastavrou, and Shaffer, and (ii) the approval, on a non-binding, advisory basis, of the compensation of certain executive officers (including defendants Jacobs, Hardig and Malat). In addition, the 2018 Proxy contained a stockholder proposal regarding the Company's executive compensation clawback policy. The Board sought a "for" vote in connection with the director elections and executive compensation, and an "against" vote in connection with the stockholder proposal. Defendants Jacobs, Ashe, DeSalva, Jesselson, Kingshott, Papastavrou, and Shaffer got their way in connection with each of these votes.

268.    In support of these votes, the 2018 Proxy described director responsibilities, the duties of each committee, Board risk assessment and management, and explicitly referenced the

Code, which includes special ethical obligations regarding financial reporting such that all SEC

filings are to be accurate.

269.    The 2018 Proxy also stated:

> **Throughout 2017, our NEOs executed our strategy for high growth and high returns, successfully meeting rigorous financial performance goals** and continuing to grow XPO as one of the ten largest logistics companies in the world. During this period, we continued to execute our strategy and optimize our operations as a highly efficient, integrated network of people, technology and physical assets; **we enhanced our leadership positions in high-growth sectors such as last mile logistics and e-commerce order fulfillment**; we helped more than 50,000 customers manage their goods more efficiently throughout their supply chains; we refinanced all of our bank debt at lower rates; and we completed a public equity offering that has provided additional funding for future acquisitions. **Our success is a result of having strong leadership, excellent operators, a motivated workforce engaged in our vision, a culture of accountability and meticulous growth plans for each line of business.** As of December 31, 2017, our network encompassed over 95,000 employees and 1,455 locations in 32 countries, primarily in North America and Europe.

(Emphasis added).

270.    The 2018 Proxy was false and misleading because it solicited XPO shareholder

votes for director reelection, an advisory vote on executive compensation and a stockholder

proposal regarding the Company's executive compensation clawback policy even though

defendants Jacobs, Ashe, DeSalva, Jesselson, Kingshott, Papastavrou, and Shaffer were aware, but

had failed to disclose: (1) Amazon generated material and unsustainable growth for XPO during

the 2016-2018 timeframe because—as Amazon told XPO—Amazon was going to stop doing

business with XPO over the long term; and (2) Amazon acted on its stated business plans and

started reducing its business with XPO around April 2018.

271.    Without this information, the Board got the results it sought in connection with the

2018 Proxy.

272.     Had truthful disclosures been made by defendants Jacobs, Ashe, DeJoy, DeSalva, Jesselson, Kingshott, Papastavrou and Shaffer in connection with the 2018 Proxy, defendants Jacobs, Ashe, DeJoy, DeSalva, Jesselson, Kingshott, Papastavrou, and Shaffer would not have been elected as directors, XPO's shareholders would not have approved the executive compensation in 2018 and would have voted in favor of the stockholder proposal regarding the Company's executive compensation clawback policy in 2018.

## THE TRUTH IS REVEALED

273.     By the second week of December 2018, XPO was close to buying another company in a deal would have effectively *doubled* XPO's $17 billion a year size. A deal of this size would have given XPO the ability to largely bury the ongoing negative effects of Amazon's decision to leave XPO.

274.     But the Individual Defendants ultimately squandered XPO's prospects to complete a merger by disclosing negative information related to its loss of Amazon business. After letting slip material non-public information at private lunch with analysts, the Individual Defendants were forced on December 12, 2018, to reveal that: (1) XPO was not going to make its 2018 free cash flow guidance of $625 million without accelerating its use of nearly all of the Company's $188 million in available tax benefits; (2) XPO would be lowering its free cash flow guidance for the entire 2019 year; and (3) XPO would be revising its "base-case" growth assumptions that defendant Jacobs communicated just six weeks earlier, from 15%-18% growth down to 12%-15%. This news directly implicated XPO's loss of Amazon business—having begun losing Amazon in 2018, the Company was unable to meet its free cash flow guidance, and the effects of Amazon's departure meant XPO would not earn or grow as much in 2019 as it had previously told the market.

275.     The negative news from XPO continued to ripple through the market as, on the following day of December 13, 2018, a short seller (Spruce Point) published a negative report that

criticized XPO's management and the accuracy and clarity of XPO's disclosures to investors. Although analysts were highly skeptical of the report, it nonetheless kept the market focused on XPO and its highly disappointing December 12, 2018 disclosure.

276.    The market was indeed dismayed by the Individual Defendants' surprise December 12 announcement. Analysts from Wells Fargo, for example, wrote on December 14, 2018 that "[t]he free cash flow guide for 2019 [of $650M] was disappointing relative to prior Street estimates of $884MM." Analysts from J.P. Morgan stated on December 13, 2018 that "[w]e are lowering our estimates following [XPO's December 12, 2018] Reg FD filing that provided guidance below 2019 expectations . . . ." J.P. Morgan also expressed continued concern: "[t]he stock appears completely disconnected from fundamentals as an opportunistically timed short report this morning targeted XPO "

277.    Roughly a month later, on January 22, 2019, J.P. Morgan summarized investor sentiment at the time of XPO's December 12 disclosure, noting that a "number of investors deeming the stock 'untouchable' after the recent C-suite turnover, earnings miss, and Reg FD disclosure were capped by [the short-seller] report."

278.    The Individual Defendants' December 12 disclosure triggered a two-day decline that wiped out *33% of the Company's market value* on heavy trading volume, as its per share stock price fell from $66.69 at the close of trading on December 11, 2018 to $44.50 at the close of trading on December 13, 2018.

279.    Analysts at the time noted XPO's lack of transparency. For example, on December 12, 2018, Stephens analysts rated XPO "Equal-Weight given limited visibility into the drivers of [XPO's] business" and "limited commentary in the Company's 8K filing as to the drivers of the reduced adj. EBITDA growth outlook." On December 17, 2018, a Barclays analyst recommended

XPO "provide a more transparent income statement." Thus, despite revealing Amazon-related misses, the December 12 announcement did not fully reveal the truth about Amazon's inevitable and ongoing departure from XPO.

280.    Without full transparency, analysts continued to believe XPO's claims about being well diversified and still predicted that XPO had good long-term growth potential. For example, J.P. Morgan analysts reported on December 13, 2018 that "[l]ong-term growth potential and margin outlook remain intact," because "XPO has built a diverse transportation and logistics model that operated well in a strong freight market." That same day, Jeffries analysts predicted XPO having significantly higher EBIT growth than logistics peers because of XPO's "differentiated e-commerce logistics platform," and Morgan Stanley analysts remained favorable on XPO because, in part, "XPO is the most diversified company we cover." Analysts at the time thus viewed XPO's downward revision as "less about structural impairment in demand, but rather prudent conservatism given slowdown in Europe and trade concerns," as described by Deutsche Bank on December 12, 2018.

281.    But the Individual Defendants would eventually be forced to reveal the entire truth about Amazon because the damage to XPO's stock price from the December 12 announcement meant that XPO's planned blockbuster merger was no longer a viable way for XPO to bury the Amazon problem.

282.    Because XPO failed to secure a merger partner, on February 14, 2019, it had to file its own standalone financial statements for the quarter and year ending 2018 without the benefit of mixing XPO's financial statements with those of a similarly-sized company on a "consolidated" basis. After the market closed on that date, XPO filed several reports with the SEC that further revealed the effects that Amazon's departure had on XPO's business. And Jacobs led a conference

call the next day by stating: "we missed the quarter *[a]nd in December, our largest customer pulled back* their postal injection business, which is part of last mile. *That affected our EBITDA in December. This had a significant impact in December and in the quarter*."

283.    Defendant Jacobs then admitted that Amazon's business contributed materially to XPO's growth over the preceding few years and that he knew the growth would come to end given Amazon's stated business plans:

> [H]ave we grown with [our largest customer]? Yes, we grew a lot up with them over the last few years. And we knew that, that business wasn't going to stay forever and forever and ever and ever because of that particular customer's stated business plans and because that customer is transactional in some respect in terms of the nature that they have with their vendors.

284.    Analysts asked questions about this February 15, 2018 admission, demonstrating that reasonable investors (including analysts who covered XPO) read XPO's disclosures—and assurances about House of Fraser being a "one off" occurrence—to mean that XPO did not expose them to the kind of extreme customer and market concentration that Amazon represented:

> [BofA Merrill Lynch analyst:] So I wanted to start talking about customer concentration. One of the things that I think XPO has touted as one of its strengths is that it's not overly focused on any particular customer. But here, we've seen kind of 2 quarters in a row where some disappointing news from a particular customer has really put a real dent in results. And I want to talk about—I kind of want to get your thoughts on the extent to which maybe that perception is changing or how you manage your customer base maybe has shifted? . . .

> [Jacobs:] Well, in 2018, our top 5 customers represented about 11% of revenue, and you saw that in the K. The largest customer, however, represented roughly about 4%, 5% of that. 2/3 of that business has gone away, so that's a body blow, no question about it. Going forward, with that customer having downsized, we anticipate that our top 5 customers in 2019 will represent about 8% of revenue. So customer concentration will be less. But when you lose your—when you lose the majority of your top customer's business, that hurts. Nothing you can do—there's nothing positive. It's only negative.

285.    On this same subject defendant Jacobs later admitted:

> I'd also talk to you about our customer concentration. *Our customer concentration, it was too much*. We made a mistake letting one customer get $900 million of

business with us. [It was] *just too much*. [It was] *too much concentration*. Previously, if you looked at our top 5 customers, it was about 11% of revenue and the biggest one was a little more than 1/2 of that, so *it was just too much concentration*. Going forward, we're going to be much more diversified. Our top 5 customers this year should be something around 7% of revenue and no customer will be more than 2% of revenue.

286.    Analysts reacted negatively to the news that XPO had been overly reliant on a single, unsustainable customer whose business was already starting to go away. On February 15, 2019, Barclays wrote that they were "materially lowering our price on XPO shares given a significant strategic shift and continuing earning headwinds," while noting the loss of "a large shipper (likely Amazon)." And SunTrust analysts, on February 14, 2019, deemed the results "[h]eartbreaking."

287.    Following the February 15 conference call that revealed Amazon's strategic and financial importance to XPO (before the market opened), the Company's stock price fell from a close of $59.55 the day before to $51.97 at the close of trading, *for a loss of 12.73%*, on heavy trading volume.

## DAMAGES TO XPO

288.    As a result of the Individual Defendants' wrongful conduct, XPO disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made. The improper statements have devastated XPO's credibility. XPO has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

289.    Indeed, the Individual Defendants' false and misleading statements as alleged above, have subjected XPO to a complaint for violations of the federal securities laws filed in the United States District Court for the District of Connecticut. The Securities Class Action is described in the in the 10-Q filed by the Company on August 1, 2019:

On December 14, 2018, two putative class actions were filed in the U.S. District Court for the District of Connecticut and the U.S. District Court for the Southern District of New York against the Company and certain of its current and former executives, alleging violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, as well as Section 20(a) of the Exchange Act, based on alleged material misstatements and omissions in the Company's public filings with the U.S. Securities and Exchange Commission. On January 7, 2019, the plaintiff in one of the class actions, *Leeman v. XPO Logistics, Inc. et al.*, No. 1:18-cv-11741 (S.D.N.Y.), voluntarily dismissed the action without prejudice. In the other putative class action, *Labul v. XPO Logistics, Inc. et al.*, No. 3:18-cv-02062 (D. Conn.), which is pending in the U.S. District Court for the District of Connecticut, on April 2, 2019, the court appointed Local 817 IBT Pension Fund, Local 272 Labor-Management Pension Fund, and Local 282 Pension Trust Fund and Local 282 Welfare Trust Fund (together, the "Pension Funds") as lead plaintiffs. On June 3, 2019, the Pension Funds, with additional plaintiff Norfolk County Retirement System, filed a consolidated class action complaint against the Company and certain of its current and former executives, alleging violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Section 20(a) of the Exchange Act, and Sections 11 and 15 of the Securities Act, based on alleged material misstatements and omissions in the Company's public filings with the U.S. Securities and Exchange Commission.

290.    As a direct and proximate result of the Individual Defendants' actions as alleged above, XPO's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

291.    Moreover, these actions have irreparably damaged XPO's corporate image and goodwill. For at least the foreseeable future, XPO will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that XPO's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## PLAINTIFF'S DEMAND AND DERIVATIVE ALLEGATIONS

292.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

293.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

294.   Plaintiff is an owner of XPO common stock and was an owner of XPO common stock at all times relevant hereto.

295.   Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

296.   As a result of the facts set forth herein, Plaintiff has not made any demand on the XPO Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

297.   At the time this action was commenced, the Board consisted of eight directors: defendants Jacobs, Ashe, DeSalva, Jesselson, Kingshott, Papastavrou, and Shaffer (the "Director Defendants"), and non-party Marlene M. Colucci (together with the Director Defendants, the "Current Board"). The Director Defendants and the Current Board are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

***Demand is Futile as to Defendants Jacobs, Ashe, DeSalva, Jesselson, Kingshott, Papastavrou, and Shaffer because they each face a Substantial Likelihood of Liability***

298.   Defendants Jacobs, Ashe, DeSalva, Jesselson, Kingshott, Papastavrou, and Shaffer all face a substantial likelihood of liability for their individual misconduct. Defendants Jacobs, Ashe, DeSalva, Jesselson, Kingshott, Papastavrou, and Shaffer were directors either throughout, or part of, the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

299.   Moreover, Defendants Jacobs, Ashe, DeSalva, Jesselson, Kingshott, Papastavrou, and Shaffer, as directors owed a duty to, in good faith and with due diligence, exercise reasonable

inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and consciously reviewed, authorized and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

300.    Defendants Jacobs, Ashe, DeSalva, Jesselson, Kingshott, Papastavrou and Shaffer are not disinterested because they each face a substantial likelihood of liability in light of their false and misleading statements as outlined above. All of these defendants signed the false and misleading 2017 10-K. In addition, defendants Jacobs, Ashe, Jesselson, Kingshott, Papastavrou and Shaffer also signed the false and misleading 2016 10-K. Furthermore, defendant Jacobs signed the false and misleading 10-Qs filed with the SEC during the Relevant Period.

301.    Defendants Jacobs, Ashe, DeSalva, Jesselson, Kingshott, Papastavrou, and Shaffer conscious and knowing making or authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the Defendants Jacobs, Ashe, DeSalva Jesselson, Kingshott, Papastavrou, and Shaffer face a substantial likelihood of liability.

302.    Specifically, as directors of the Board, defendants Jacobs, Ashe, DeSalva, Jesselson, KingShott, Papastavrou, and Shaffer knew XPO's customer concentration risk was increasing throughout the Relevant Period. Indeed, Form 10-Ks authorized by defendants Jacobs,

Ashe, DeSalva, Jesselson, KingShott, Papastavrou, and Shaffer and filed with the SEC throughout the Relevant Period highlights that XPO's customer concentration risk was increasing due to its increasing revenues from Amazon.

303.    The 2015 10-K stated:

**Customers, Sales and Marketing**

Our Company provides services to a variety of customers ranging in size from small, entrepreneurial organizations to *Fortune 500* companies. During 2015, our business units served more than 50,000 different customers. **Approximately 6.6% of our 2015 pro forma revenue was attributable to our top five clients, with our largest customer accounting for approximately 1.8% of our pro forma revenue.**

(emphasis added).

304.    The 2016 10-K stated:

**Customers, Sales and Marketing**

Our Company provides services to a variety of customers ranging in size from small, entrepreneurial organizations to multi-national industry leaders. We have a diversified customer base that minimizes our concentration risk: **in 2016, approximately 8% of our revenue was attributable to our top five clients, with our largest customer accounting for approximately 3% of revenue.**

Our customers are engaged in a wide range of industries, including high tech, retail, e-commerce, manufacturing, telecommunications, aerospace and defense, life sciences, healthcare, medical equipment, agriculture, and food and beverage. In 2016 **retail and e-commerce accounted for the largest portion of our global revenue at 26%,** followed by food and beverage at 14%.

(emphases added).

305.    The 2017 10-K stated:

**Customers, Sales and Marketing**

Our Company provides services to a variety of customers, ranging in size from small, entrepreneurial organizations to *Fortune 500* companies and global industry leaders. We have a diversified customer base that minimizes our concentration risk: **in 2017, approximately 10% of our revenue was attributable to our top five customers.**

Our customers are engaged in a wide range of industries, including retail, e-commerce, food and beverage, manufacturing, technology and telecommunications, aerospace and defense, life sciences, healthcare, medical equipment, and agriculture. **In 2017, retail and e-commerce accounted for the largest portion of our global revenue at 29%, compared with 26% in 2016**; followed by food and beverage at 16% in 2017, compared with 14% in 2016.

(emphases added).

306.    Further, knowing that growing risk of customer concentration would lead to negative response from the public investors, defendants Jacobs, Ashe, DeSalva, Jesselson, KingShott, Papastavrou, and Shaffer, as shown above, began concealing the size of its largest customer beginning with XPO's 2017 10-K.

307.    If Defendants Jacobs, Ashe, DeSalva, Jesselson, Kingshott, Papastavrou, and Shaffer were to bring a suit on behalf of XPO to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason demand is futile as to Defendants Jacobs, Ashe, DeSalva, Jesselson, Kingshott, Papastavrou, and Shaffer.

***Defendant Jacobs Lacks Independence***

308.    Demand on Defendant Jacobs is also futile for several reasons. Defendant Jacobs has served as the Company's CEO and Chairman of the Board since September 2011. As such, the Company provides Defendant Jacobs with his principal occupation and he receives meaningful compensation as described above, including $13,327,471 during the fiscal year ended December 31, 2018. Moreover, Defendant Jacobs was also personally responsible for many of the false and misleading statements and omissions that were made, including those contained in the foregoing 10-Qs and 10-Ks which he signed, and for which he also signed SOX certifications

309.   Furthermore, Defendant Jacobs is also the managing member of JPE and is a controlling shareholder of the Company. Thus, as is noted in the 2018 10-K, he is not only a non-independent director, but he has substantial control over the Company.

310.   Additionally, as the Company's highest officer, controlling shareholder, and as a director, he was fully aware that XPO's forecast financials that he repeatedly touted, were dependent upon Amazon remaining a full time and engaged client of the Company and that in fact, Amazon had already stated its intention to leave XPO and had begun that process. Based on this knowledge, Defendant Jacobs knew that the Company was issuing false and misleading statements and therefore is interested in the allegations described herein because he faces a substantial likelihood of liability.

311.   Finally, Defendant Jacobs is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.

**Defendant Ashe Lacks Independence**

312.   Defendant Ashe signed, and thus personally made the false and misleading statements in, the 2016 10-K and 2017 10-K. Accordingly, defendant Ashe breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

**Defendant Jesselson Lacks Independence**

313.   Defendant Jesselson signed, and thus personally made the false and misleading statements in, the 2016 10-K and 2017 10-K. Accordingly, defendant Jesselson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

***Defendant Kingshott Lacks Independence***

314.    Defendant Kingshott signed, and thus personally made the false and misleading statements in, the 2016 10-K and 2017 10-K. Accordingly, defendant Kingshott breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

***Defendant Papastavrou Lacks Independence***

315.    Defendant Papastavrou signed, and thus personally made the false and misleading statements in, the 2016 10-K and 2017 10-K. Accordingly, defendant Papastavrou breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

***Defendant Shaffer Lacks Independence***

316.    Defendant Shaffer signed, and thus personally made the false and misleading statements in, the 2016 10-K and 2017 10-K. Accordingly, defendant Shaffer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

***Demand Is Excused as to the Entire Current Board Because They Are Beholden to Jacobs***

317.    Demand is excused in this case because the Current Board is beholden to and controlled by JPE and thus by JPE's managing member, defendant Jacobs, by virtue of JPE's controlling stake over the Company. As the Company admitted in its 2018 10-K, defendant Jacobs' shareholdings provide him with significant control over the continued employment of the Current Board. In fact, defendants Jesselson, Kingshott, Papastavrou and Shaffer were appointed to the Board in connection with defendant Jacobs' purchase of control of XPO in September 2011.

***Demand is Excused as to Defendants Kingshott, Papastavrou and Shaffer Because of Their Longstanding Business Ties With Defendant Jacobs***

318.    Defendants Kingshott, Papastavrou, and Shaffer have other business ties to defendant Jacobs. Prior to taking control of XPO, defendant Jacobs was Chairman and CEO of United Rentals, Inc. ("URI"). The company went public in December 1999 and began trading on the New York Stock Exchange. Jacobs stepped down from United Rentals in August 2007.

319.    On September 8, 2008, the SEC filed a complaint against URI. The complaint alleged that, from late 2000 through 2002, URI engaged in a series of fraudulent transactions undertaken in order to meet URI's earnings forecasts and analyst expectations. The fraud was accomplished primarily through a series of interlocking three-party sale-leaseback transactions orchestrated by URI's then-CFO Michael J. Nolan ("Nolan"), and its then-Chief Acquisitions Officer, John N. Milne ("Milne"). The complaint further alleged that, that from 1997 to 2000, during a period of enormous growth through acquisitions, URI engaged in other improper accounting practices involving its valuations of acquired assets, use of acquisition reserves, and accounting for customer relationships as well as improperly accounting for other items that overstated net income, including its estimation and recording of self-insurance reserves, its recognition of equipment rental revenues, and its income tax accounting.

320.    Defendant Papastavrou served on the board of directors of URI, and was serving on the URI board of directors when appointed as the Chairman of the Audit Committee, the Audit Committee "Financial Expert" and a member of the Nominating Committee of the Company in 2005.

321.    According to the Spruce Report, defendant Kingshott was involved a managing director at Goldman Sachs when it did business with URI.

322.    According to the Spruce Report, defendant Shaffer sits on the Board of Directors at "Terex Corp," a company that was charged with aiding and abetting URI for the fraudulent transactions investigated by the SEC.

323.    Given these longstanding business connections, defendants Papastavrou, Kingshott and Shaffer are unable to disinterestedly consider a demand and therefore demand is excused as to these defendants.

**_Demand Is Excused as to Defendants Ashe, Jesselson, Kingshott, Papastavrou, and Shaffer Because They Face a Substantial Likelihood of Liability as Members of the Audit Committee_**

324.    Defendants Ashe, Jesselson, Kingshott, Papastavrou and Shaffer, as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements and allowing defendants Jacob, Hardig and Malat to repeatedly make other false and misleading statements to the investing public. More specifically, as members of the Audit Committee, Defendants Ashe, Jesselson, Kingshott, Papastavrou and Shaffer were obligated to review the Company's annual and quarterly reports to ensure their accuracy. Instead, Defendants Ashe, Jesselson, Kingshott, Papastavrou and Shaffer, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and other financial information provided by the Company, as required by the Audit Committee Charter. For this reason, demand is futile as to Defendants Ashe, Jesselson, Kingshott, Papastavrou and Shaffer.

**_Demand is Futile as to the Director Defendants for the Following Additional Reasons_**

325.    If XPO's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders. However, Plaintiff is

informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by XPO against the Individual Defendants, known as the "insured versus insured exclusion."

326.     As a result, if the Director Defendants were to sue themselves or certain of the officers of XPO, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

327.     Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting XPO by prosecuting this action. Therefore, demand on XPO and its Board is futile and is excused. XPO has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing. Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct. Thus, Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

## CAUSES OF ACTION

### COUNT I
### Against the Individual Defendants for Breach of Fiduciary Duty

328.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

329.     The Individual Defendants owed and owe XPO fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe XPO the highest obligation of loyalty, good faith, due care, oversight, fair dealing, and candor.

330.     All of the Individual Defendants violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, and candor.

331.     Each of the Individual Defendants had actual or constructive knowledge that the Company's largest customer, Amazon, was responsible for the Company's growth during the Relevant Period, created a customer "concentration risk" and was leaving XPO, yet the Individual Defendants time and again did not credit Amazon for XPO's growth, denied XPO faced any customer concentration risk and acted as if the Company's relationship with Amazon was on solid footing. These actions caused severe risks to the Company and were actually causing harm to the Company by subjecting the Company to the Securities Class Action. The Individual Defendants' actions (and inactions) could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

332.     The Individual Defendants caused or allowed XPO to lack requisite internal controls, and, as a result, the Company regularly made false and misleading statements regarding its past growth, the reasons for its growth and XPO's future financial growth.

333.     The Individual Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company.

334.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, XPO has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. The Individual Defendants breached their fiduciary duties owed to XPO and its shareholders by willfully, recklessly, and/or

intentionally failing to perform their fiduciary duties. They caused the Company to waste valuable assets and unnecessarily expend corporate funds. They also failed to properly oversee XPO's business, rendering them personally liable to the Company.

**COUNT II**
**Against Defendants Jacobs and Harding for Unjust Enrichment**

335.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

336.    Defendants Jacobs and Harding received performance-based compensation tied to the financial performance of XPO. Because XPO's financial results were inflated during the Relevant Period as a result of the wrongdoing alleged herein, defendants Jacobs and Harding received more compensation than they would have received had the truth that: (1) Amazon generated material and unsustainable growth for XPO during the 2016-2018 timeframe because—as Amazon told XPO—Amazon was going to stop doing business with XPO over the long term; and (2) Amazon acted on its stated business plans and started reducing its business with XPO around April 2018, been disseminated in a timely manner. Therefore, defendants Jacobs and Harding were unjustly enriched at the expense of and to the detriment of the Company.

337.    Defendants Jacobs and Harding knew or should have known that the Company's representations were false and misleading, all of which resulted in XPO's financial results and performance being artificially inflated due to the wrongdoing identified herein.

338.    By their wrongful acts and omissions, defendants Jacobs and Harding were unjustly enriched at the expense of, and to the detriment of, XPO.

339.    To remedy defendants Jacobs and Harding's unjust enrichment, the Court should order defendants Jacobs and Harding to disgorge any performance-based compensation that was

100

received during, or as a result of, the Individual Defendants' breach of fiduciary duties and other violations of law complained of herein.

### COUNT III
### Against The Individual Defendants for Violations of § 14(a) of the 1934 Act and SEC Rule 14a-9 Promulgated Thereunder

340.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

341.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

342.    The 2017 Proxy and 2018 Proxy each violated Section 14(a) and Rule 14a-9 because they solicited XPO shareholder votes for, *inter alia,* director elections, executive compensation and an executive compensation clawback, while simultaneously misrepresenting and/or failing to disclose the Company's complete reliance on Amazon for its stunning financial growth and the fact that XPO was in the process of losing Amazon as a customer.

343.    The Individual Defendants' statements in the 2017 Proxy and 2018 Proxy, which clearly represented that the Board had director responsibilities and duties that were adhered to, that the maintained proper and effective internal controls regarding financial performance and followed a pay for performance policy were false and misleading because the 2017 Proxy and 2018 Proxy failed to disclose that the Company's financial performance was illusory and misstated. By the time the 2017 Proxy and 2018 Proxy were issued, the Individual Defendants already knew of the significant problems associated with the Company's relationship with Amazon, and therefore as a

result, the Company's purported financial performance (issued under the Individual Defendants' direction and on their watch) was illusory.

344.    The Individual Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder. By virtue of their positions within the Company and/or roles in the process and in the preparation of the 2017 Proxy and 2018 Proxy, the Individual Defendants were aware of this information and of their duty to disclose this information in the 2017 Proxy and 2018 Proxy.

345.    In the exercise of reasonable care, the Individual Defendants should have known that the statements contained in the 2017 Proxy and 2018 Proxy were materially false and misleading.

346.    The omissions and false and misleading statements in the 2017 Proxy and 2018 Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the election of directors the compensation for executive officers, whether the advisory vote on executive compensation should be approved, and whether an executive compensation clawback was necessary. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 2017 Proxy and 2018 Proxy and in other information reasonably available to shareholders.

347.    As a direct and proximate result of the dissemination of the false and/or misleading 2017 Proxy and 2018 Proxy the Individual Defendants used to obtain shareholder approval of and thereby elect directors, approve an advisory vote to pay excessive compensation to executive officers, and fail to institute a strengthened executive compensation clawback policy, nominal defendant XPO suffered damage and actual economic losses (*i.e.*, wrongful re-election of directors

and paying compensation based on inflated financials to executives) in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Declaring that Plaintiff may maintain this derivative action on behalf of XPO and that Plaintiff is a proper and adequate representative of the Company;

B.     Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.     Ordering defendants Jacobs and Harding to disgorge any performance-based compensation that was received during, or as a result of, the Individual Defendants' breaches of fiduciary duties complained of herein;

D.     Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

E.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: September 27, 2019

Respectfully submitted,

**COOCH AND TAYLOR, P.A.**

*/s/ Blake A. Bennett*
Blake A. Bennett (#5133)
The Nemours Building
1007 N. Orange Street, Suite 1120
Wilmington, DE 19801
Telephone: (302) 984-3800
Email: bbennett@coochtaylor.com
*Attorney for Plaintiff*

**OF COUNSEL**

**BRAGAR EAGEL & SQUIRE, P.C.**
W. Scott Holleman
Marion C. Passmore
Garam Choe
Alexandra B. Raymond
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone: (212) 308-5858

**HYNES & HERNANDEZ, LLC**
Michael J. Hynes
Ligaya T. Hernandez
101 Lindenwood Drive, Suite 225
Malvern, Pennsylvania 19355
Telephone: (484) 875-3116

*Attorneys for Plaintiff*